KINGS ELECTRONICS CO., Inc.

v.

The UNITED STATES.

No. 487-56.

United States Court of Claims.

Feb. 19, 1965.

John I. Heise, Jr., Washington, D. C., for plaintiff. Edgar Parke Reese, Washington, D. C., on the briefs.

Richard R. Molleur, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Raymond R. Robrecht, Jr., Atlanta, Ga., on the brief.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

COLLINS, Judge.

This action is based upon a contract entered into by plaintiff, Kings Electronics Co., Inc., and the Department of the Navy's Bureau of Ships for the manufacture of 28-foot and 35-foot aluminum whip antennas. Plaintiff seeks damages for an alleged breach of the contract or, in the alternative, seeks an equitable adjustment of the contract price.

After receipt, in September 1950, of an invitation to bid, Morton Weissman, president of plaintiff, prepared the bid for his company. In determining the amount and type of material required for each antenna, he used the drawings which were part of the invitation. Weissman assumed that standard commercial aluminum tubing could be used. The bid of plaintiff was submitted on October 13, 1950.

On November 17, 1950, the contract (No. NObsr–52087) was awarded to plaintiff; delivery was to begin within 90 days. Plaintiff received notice of the award no later than December 1, 1950, and began to process the contract on December 20th. Samuel H. Jackson, plaintiff's project engineer, requested from the Navy Bureau of Ships the latest revision of specification 44T30, the specification (for aluminum tubing) referred to in the drawings. In response, the Navy, in January 1951, sent specification MIL–T–855, which included the statement that it superseded specification 44T30b insofar as purchases for the Bureau of Ships were concerned. Jackson proceeded under the assumption that MIL–T–855 was applicable to the contract.

Shortly after the engineering work began, Jackson encountered difficulty with regard to the tolerances pertaining to the aluminum tubing. Jackson believed that it would not be feasible to meet the dimensional requirements of the drawings with tubing ordered in accord with the specification. In an effort to resolve this matter, plaintiff conferred with Aluminum Company of America, its supplier. In January and in March of 1951, Alcoa submitted proposals to plaintiff, but plaintiff did not consider them to be acceptable. Finally, on April 4, 1951, Jackson wrote the contracting officer of

the difficulty. Jackson's letter described the dimensions of the tubing available from Alcoa which came closest to meeting the requirements of the contract and requested approval of changes in the tolerances for the inside and outside diameters.

On April 5, 1951, prior to receiving the letter from Jackson, the contracting officer wrote plaintiff that, due to its failure to make deliveries as required, plaintiff was in default. Plaintiff was directed to cure the default within 10 days or to show why the contract should not be terminated.[1] As a result of this correspondence, a meeting was held on April 26, 1951, between representatives of plaintiff and of the Navy. The contract was not terminated, and plaintiff's proposal with regard to tolerances was accepted by the contracting officer.

On May 3, 1951, plaintiff submitted to the contracting officer its first progress report.[2] After obtaining the agreement of Alcoa to an August delivery schedule, plaintiff placed its order for the aluminum tubing. On May 31, Alcoa returned the order to plaintiff because new directives regarding the allotment of strategic materials had been issued. The original allocation to plaintiff had been made on the basis of regulations which would cease to be effective after July 1951. Plaintiff's efforts to obtain aluminum from other sources were unsuccessful; however, in July plaintiff received a priority under the new regulations. Alcoa sent plaintiff formal acknowledgment of the purchase order; delivery was to be in November 1951.

In August 1951, Alcoa had called to plaintiff's attention the need to alter the elongation test provisions contained in specification MIL–T–855.[3] At a meeting on September 26, 1951, this matter was

1. Actually, the letter related to two contracts, NObsr–52087 and another contract which is not involved in the present action.

2. The invitation for bids which became part of the contract contained a requirement that progress reports to the inspector be submitted by plaintiff at least once each month.

3. Specification 44T30 had contained the standard provisions regarding the elongation test, but a certain portion had been omitted from MIL–T–855. The purpose of the suggested alteration was to cure this omission.

resolved when the contracting officer orally accepted the proposed alteration.

On October 29, 1951, the Navy wrote plaintiff that a change from specification MIL–T–855 to specification WW–T–789 was contemplated. At a conference on October 31, Weissman told the contracting officer that the contemplated change would require plaintiff to "start from scratch." At that time, Weissman requested that the contract be terminated without cost to either party. The contracting officer did not terminate the contract, and plaintiff, at the urging of the contracting officer, continued its performance.

In November 1951, when the aluminum began to arrive, plaintiff's facilities were entirely occupied. Plaintiff then elected to perform by subcontracting the manufacture of the antennas.

The contract was completed in July 1953. At the suggestion of the contracting officer, plaintiff filed a request for a contract price increase pursuant to Title II of the First War Powers Act of 1941.[4] Subsequently, this claim was withdrawn and resubmitted in the form of a claim for an equitable adjustment under the "Changes" article. On February 3, 1956, the contracting officer denied plaintiff's claim. An appeal to the Armed Services Board of Contract Appeals resulted (on March 27, 1958) in a decision adverse to plaintiff. In the present action, plaintiff seeks to recover $149,608.94, which represents its losses of $144,108.32[5] plus $5,500.62, the 5 percent profit which, according to plaintiff, was included in its bid.

Plaintiff asserts that, under either the breach of contract or the equitable adjustment theory, the measure of damages should be the total amount of plaintiff's losses, plus the 5 percent profit included in the bid. Defendant denies any liability to plaintiff. This court finds neither party's position to be totally convincing. Although not persuaded that plaintiff should recover the entire amount claimed, we are of the opinion that defendant is liable for some of plaintiff's losses.

THE MATTER OF DELAYS

Plaintiff's argument is based, to a considerable extent, upon the assumption that defendant must bear the responsibility for the delays which occurred during the performance of the contract and for losses allegedly caused by the delays. Completion of the contract, although originally scheduled for May 1951, did not occur until July 1953. Undoubtedly, certain of plaintiff's losses resulted from the protraction of performance of the contract. The initial issue, then, is whether or not the various delays are attributable to the Government.

First, consideration must be given to the lapse of time which occurred between December 1, 1950, the date by which plaintiff had received notice of award of the contract, and April 4, 1951, when plaintiff wrote defendant regarding the problem of "tolerances." This initial period of delay is important, for, according to plaintiff, the time consumed in dealing with the matter of "tolerances" had a causal relation with the subsequent delays.

■ For purposes of the immediate discussion, it is assumed that the drawings and specifications of the contract did contain a conflict with regard to dimensional tolerances. One significant fact is that, although plaintiff's project engineer discovered the problem in December 1950, it was not until April 4, 1951, that plaintiff informed the Government of the matter. In an effort to justify their actions, plaintiff's officers testified that, as the contractor, plaintiff had the responsibility to find the best possible solution and that the first suitable proposal reached was the one contained in

4. The Act, as amended, is found in 50 U.S.C.App. § 611.

5. Plaintiff was paid $110,012.37 under the contract; this included compensation for

a change regarding anodizing. The amount $144,108.32 represents the excess of plaintiff's expenses over the amount received.

plaintiff's letter of April 4 (which proposal was subsequently accepted by defendant). Conceding *arguendo* that, during the period prior to April, plaintiff made a diligent effort to arrive at a solution, there is still no adequate basis for plaintiff's contention that responsibility for this delay must be placed upon the Navy. If, within a reasonable time after discovery of the conflict, plaintiff had apprised the Navy of the matter, then, clearly, the time spent in reaching a solution could have been characterized as a Government-caused delay.[6] However, instead of notifying the Navy promptly, plaintiff sought to work the matter out for itself. Under these circumstances, plaintiff is not in a position to place upon the Government responsibility for the time plaintiff expended in reaching a solution. Also, it is of some significance that, despite the contractual obligation of plaintiff to submit monthly progress reports, plaintiff did not notify defendant of the difficulty until April 1951. Therefore, this court concludes that the "tolerance" delay is not attributable to the Government.[7]

Another step in plaintiff's argument is the assertion that the problem of allocation was a result of the "tolerance" delay. The original allocation of aluminum for the contract was based upon National Production Authority regulations, but these regulations were effective only until July 1951. Thus, with regard to the order placed in May 1951, calling for delivery in August, the original priority was of no avail. According to plaintiff since it was the "tolerance" delay which

caused the need to obtain new priority and the resulting postponement of delivery,[8] the party who caused the former delay was also responsible for the allocation difficulty. However, this court has found that defendant cannot be held liable for the "tolerance" delay, and it follows, therefore, that the priority matter, the second link in plaintiff's chain of causation, cannot be charged to the Navy.

The next difficulty encountered by plaintiff related to the matter of "elongation." Plaintiff asserts that the provisions of specification MIL–T–855 regarding the elongation test were defective and that the time spent in correcting this defect was another source of delay. Although defendant takes the contrary position, this court has concluded, for reasons explained *infra*, that MIL–T–855 was the applicable specification. However, the significant fact is that the elongation problem was disposed of prior to November 1951, the month during which Alcoa was to begin delivery of the aluminum. Thus, the events relating to elongation had no real delaying effect and no "delay damages" can be based upon the elongation matter.

By the time the aluminum was delivered, plaintiff's plant was fully occupied with work on other contracts. This led to the decision of plaintiff to have subcontractors produce the antennas. According to plaintiff, the necessity to use subcontractors was the culmination of the delays caused by the Government's faulty drawings and specifications. The view of plaintiff regarding causation and

---

6. Note should be made of the difference between the facts of the instant case and those of Laburnum Construction Corp. v. United States, Ct.Cl. No. 530–59 (Dec. 13, 1963), 325 F.2d 451, a case in which recovery was allowed because of delays resulting from deficiencies in Government-prepared specifications. In Laburnum, there was no need to discuss the obligation of a contractor to notify the Government upon discovery of a defect in specifications, for the facts illustrated that timely notice had been given (e. g., finding 12, slip op., p. 25). Furthermore, much of the delay was clearly at-

tributable to the tardiness of the Government, after having notice of the errors, in making corrections. It is also noteworthy that no recovery was allowed for that portion of the delay which was due to the fault of the plaintiff or to other factors beyond the control of the defendant. (Slip op., p. 11.)

7. In view of our conclusion, it is unnecessary to emphasize such facts as the several weeks' delay by plaintiff in commencing work on the contract.

8. When new priority was obtained, delivery was set for November 1951.

damages is subject to serious doubt. It is evident that a number of factors, many of which were unconnected with contract NObsr–52087, led to plaintiff's situation. For example, in scheduling its production activities, plaintiff failed to allow for the eventual manufacture of the antennas. The decision to use subcontractors was plaintiff's and the relation between (1) the consequences of subcontracting and (2) the alleged fault on the part of defendant is too remote to warrant recovery by plaintiff on this ground. This does not mean, however, that no recovery is possible; consideration must be given to losses which would have resulted whether or not performance of the contract had been protracted.

### THE MATTER OF DIMENSIONAL TOLERANCES

Of central importance is the problem of dimensional tolerances. The antennas were to consist of 7-foot lengths of hollow aluminum tubing. To enable the different sections of the antenna to fit together, the outside of one end was to be machined down and the inside of the other end was to be reamed out. Since the drawings indicated only a nominal dimension, e. g., 3.000 inches, for the middle portion of the antenna sections, Jackson found it necessary to resort to the specification in order to learn the applicable tolerances. Specification MIL–T–855 contained a table showing the tolerances for various ranges of outside diameters.[9] For the range which included the nominal dimension of 3.000

inches, the applicable tolerance was plus or minus 0.006 of an inch.[10] Under Jackson's view, this created a conflict with the drawing which indicated that the end portion, *after* machining down, was to have a *minimum* outside diameter of 3.000 inches. This was the difficulty which was the subject of plaintiff's negotiations with Alcoa in early 1951.

It is not disputed that, at the meeting on April 26, 1951, the contracting officer granted plaintiff permission to use aluminum with the tolerances proposed by plaintiff and Alcoa. However, defendant takes the position that the act of acceding to plaintiff's proposal did not amount to a "change" in the contract. Defendant relies upon a note contained in the specifications[11] which states:

"If so specified in the contract or order, a 'plus only' or a 'minus only' tolerance will be allowed on the outside diameter, in which case the tolerance shall be *double* the value of the 'plus or minus' tolerance, i. e., equal to the full range of tolerance."

According to defendant, the tolerances suggested by plaintiff are within the limits of the specification when the use of "plus only" tolerance is taken into consideration.[12] Even assuming that the limits suggested by plaintiff would be encompassed by the "plus only" tolerances, the conclusion does not necessarily follow that plaintiff's proposed limits could be used without effecting a change in the contract.

9. The same table was included in specification 44T30. See finding 11, infra.

10. The limit of 0.006 of an inch was applicable to the mean or average of two diameters (taken at any point) which intersected at right angles. To allow for the characteristic of ovality or out-of-roundness, a further limit applied to *individual* diameters; this limit was an amount equal to twice the tolerance for mean diameters. For example, regarding the tubing with nominal diameter of 3.000 inches, the limits for an individual outside diameter were plus or minus 0.012 of an inch. Thus, a given piece of tubing would satisfy the specification

if its mean outside diameter was between 3.006 and 2.294 inches and its individual outside readings were between 3.012 and 2.288 inches.

11. The note appears in both specification 44T30 and specification MIL–T–855. See finding 11, infra.

12. For example, under defendant's view, if the tubing with nominal outside diameter of 3.000 inches were ordered with "plus only" tolerance, the limits for the mean diameter would range from 3.000 to 3.012 inches and the limits for individual diameters would be 3.000 and 3.024.

■■ Contrary to defendant's interpretation of the contract, plaintiff believed that there could be no purchase of "plus only" material without express authorization from the Government. Here, the contract did not specify that "plus only" limits could be used. The word "order," as used in the note, is subject to two interpretations, namely, a purchase order sent by the contractor to its supplier, or a change order issued by the contracting officer. The latter interpretation is a reasonable one and this matter should be governed by the following rule:

"*  *  * Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted. Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it. This rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions. [Citations omitted.] Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947)."

In Anderson Construction Co. v. United States, 289 F.2d 809, 153 Ct.Cl. 475, 481 (1961), this court held that the Kiewit rule applied to the interpretation of contract drawings as well as to the interpretation of written words.

■ Thus, we conclude (1) that plaintiff was correct in assuming that "plus only" tolerances could not be used without express authorization from the Navy and (2) that the action of the contracting officer in assenting to plaintiff's proposed tolerances amounted to a "change" in the contract. In order to determine whether or not the alteration in dimensional limits should have resulted in an equitable adjustment of the contract price, further consideration must be given to the nature of the change.[13] The meeting of April 26, 1951, was significant in several respects.[14] First, after hearing plaintiff's explanation of the "tolerance conflict" and of the efforts to resolve it, the contracting officer determined not to terminate the contract for default. Secondly, the proposal of plaintiff regarding tolerances was accepted and plaintiff was authorized to establish new dates for delivery. Thirdly, though the testimony on the matter is in conflict, we find that the contracting officer did inform plaintiff that, if the Navy were responsible for the delays and plaintiff's increased costs, plaintiff would be reimbursed. These events should be sufficient to demonstrate that the contracting officer considered plaintiff's interpretation of the contract to be reasonable and found that a change was necessary in order to achieve performance of the contract. We are willing to overlook the failure of plaintiff to discover the "tolerance problem" prior to submission of its bid and, although subsequent events proved that the contract could not be performed with standard tubing, we accept as reasonable the initial assumption of plaintiff that standard commercial tubing could be used. Again, it is important to bear in mind the notion that ambiguities in Government-prepared contracts are construed against the Government. Peter Kiewit Sons' Co. v. United States, supra. We are of the opinion, therefore, that not only was a change in the contract effected but also that the change should have resulted in an

13. Contract NObsr–52087 contained the standard "Changes" article; this is quoted in finding 9, infra.

14. It should be noted that there were basic conflicts between the witnesses of defendant and those of plaintiff regarding what transpired at the April 26th meeting. The trial commissioner to a great extent accepted the version presented by plaintiff. After a review of the entire record, this court adopts for the most part the findings of the commissioner. It is significant that the commissioner had the opportunity to evaluate the witnesses. See Rule 66 of the Court of Claims (1964 rev.).

equitable adjustment of the contract price.[15]

## THE MEASURE OF RECOVERY

▆ It is apparent that plaintiff cannot recover its entire loss (exclusive of profit) of $144,108.32. The task of the court, under our theory of recovery, is to determine which of plaintiff's losses can be attributed, not to the delays, but to the use of aluminum with specially ordered dimensions. Stated differently, we must estimate what the extra costs would have been if plaintiff itself had fabricated the antennas using the custom-made tubing. In view of the manner in which the contract was actually performed, precise computation of such extra expenses is not possible. However, as stated in Western Contracting Corp. v. United States, 144 Ct.Cl. 318, 320 (1958): "This court has many times held that the measure of damages is not an exact science calling for a hard and fast rule, but is a determination based upon the facts and circumstances of each case." Thus, we must determine an amount which represents a reasonable recovery.

▆ One element which should be included in the judgment for plaintiff is the extra cost of the special aluminum; the trial commissioner found this amount to be $10,486.64.[16] Secondly, recovery for certain engineering costs is in order. Plaintiff estimated its total engineering expense to be $8,604. The commissioner found that plaintiff's claim was excessive, but that $4,302, one-half of the total, would be a reasonable amount to award for extra costs of engineering. While it seems clear that one result of the problems regarding tolerance and elongation[17] was to add to the cost of engineering, plaintiff is not entitled to recover the total amount claimed. With some hesitation because of the uncertainty involved, this court accepts the determination of the commissioner that engineering expense of $4,302 is recoverable.

Another element included by the commissioner was an estimate of the profit paid to the subcontractors. In this regard, we decline to follow the theory of the commissioner since, under our view, recovery is limited to those extra expenses which would have resulted if the manufacturing had been performed by plaintiff. However, use of the aluminum with larger tolerances was a source of increased manufacturing costs and this is the type of additional expense which would have occurred even if plaintiff had done the fabricating. As to the amount to be recovered for this element, the court can only make an estimate. The president of plaintiff, in 1953, attempted to reproduce the original cost analysis which had led to plaintiff's bid of $97,186.80. Although Weissman's reconstructed analysis is not completely accurate, it does afford a reasonable guide for measuring damages. Weissman's analysis indicates that the amount which plaintiff had planned to spend for all categories other than aluminum tubing was $37,323.80. That is, the total cost of such items as labor, manufacturing overhead, and administrative overhead was expected to be $37,-

---

15. It is correct, as defendant points out, that plaintiff in its letter of April 4, 1951, offered to pay the extra cost of the aluminum if the deviation in tolerances were granted. However, the evidence shows not that the Government relied upon plaintiff's offer, but that the contracting officer stated that the Navy would pay the extra costs incurred by plaintiff if the Navy were responsible for them. Therefore, the offer contained in the letter of April 4, 1951, does not preclude recovery by plaintiff of the expense resulting from the use of custom-made tubing. Nor does the absence of a written change order bar recovery. In the present case, as in Fox Valley Engineering, Inc. v. United States, 151 Ct.Cl. 228, 237 (1960), both the contracting officer and the ASBCA considered the merits of the claim, despite the lack of a written change order.

16. This amount includes freight charges of $2,177.39.

17. Our previous conclusion that the elongation matter was not a source of *delay* does not prevent recovery for the extra engineering expense occasioned by the defective elongation test of specification MIL–T–855. (The question of the applicable specification is discussed infra.)

323.80. In actuality, plaintiff's "other-than-aluminum" expense was $148,052.-67.[18] The latter figure represents the amount which plaintiff paid subcontractors for manufacturing the antennas. The difference of $110,728.87 between the estimated costs ($37,323.80) and the actual costs ($148,052.67) reflects the difficulties and delays in performance. Some part of this difference is attributable to the use of tubing with larger tolerances. We are of the opinion that $27,-682.22 or one-fourth of the difference is a reasonable amount for plaintiff to recover. The $27,682.22 is intended to include such costs as overhead as well as extra labor expense. Therefore, the total amount to be awarded plaintiff is $42,470.86.[19]

Having concluded that an equitable adjustment in the contract price should have been made and that plaintiff should recover accordingly, this court finds it unnecessary to discuss the contentions of plaintiff regarding impossibility of performance. We note, however, that in view of our decision regarding the delays, under no theory could plaintiff recover more than the amount described above.

### FINALITY OF ASBCA DECISION

██ One issue which remains is that of the finality of the decision of the Armed Services Board of Contract Appeals. Despite the assertion of defendant to the contrary, we hold that, in deter-

mining whether or not finality should be accorded to the findings of the ASBCA, our review is not limited to the record which was before the Board. At the trial before the commissioner of this court, defendant made no objection to the introduction of *de novo* evidence; in fact, both parties introduced such evidence. Therefore, defendant's objection (based upon United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed. 2d 652 (1963)) to the use of *de novo* evidence was waived. WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963) and Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963).

██ The denial by the Armed Services Board of Contract Appeals of the claim of plaintiff rested upon a set of conclusions, several of which differ from those reached by this court. With regard to the "elongation claim," the Board determined that the only applicable specification was 44T30 (which contained the proper elongation test) and that, therefore, no compensation was in order. The decision of this court that plaintiff can recover the extra engineering expense caused by the elongation problem is based upon a conclusion that specification MIL–T–855 became applicable. If determining which specification applied to the contract is a question of law (*i. e.*, a matter of interpreting the instruments), then it is sufficient to state our belief that the Board was incorrect.[20] However,

---

18. According to a stipulation of the parties, plaintiff's out-of-pocket costs totaled $227,348.36. The figure of $148,052.67 was arrived at by subtracting from $227,-348.36 the cost of the aluminum and the payments for anodizing. See finding 37, infra.

19. The total was arrived at by adding the following items:

| | |
|---|---|
| Extra cost of aluminum.... | $10,486.64 |
| Additional engineering expense.................. | 4,302.00 |
| Recoverable portion (25%) of increased costs of manufacturing.......... | 27,682.22 |
| Total................. | $42,470.86 |

We have declined to include the element of lost profit since plaintiff has not shown that it would have earned any profit under its original bid.

Plaintiff is not entitled to interest on its claim. 28 U.S.C. § 2516(a) states: "Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof."

20. The distinction between questions of fact and questions of law is discussed in River Construction Corp. v. United States, 159 Ct.Cl. 254, 262 (1962).

even if the matter is a question of fact, we reach the same result, because the record shows that both parties considered specification MIL–T–855 to be applicable. At a meeting with plaintiff on September 26, 1951, the contracting officer permitted the exception to the elongation test of MIL–T–855; on October 29, 1951, the Inspector of Naval Material in New York wrote plaintiff that, with regard to contract NObsr–52087, the Bureau of Ships was contemplating a change from specification MIL–T–855 to specification WW–T–789. It is unnecessary to comment upon the other matters in support of plaintiff's view, for the above two actions on the part of Navy personnel demonstrate conclusively that MIL–T–855 was applicable to the contract. Thus, the decision that the only relevant specification was 44T30 was not based upon substantial evidence.

In denying the "tolerance" claim, the Board rested upon its conclusion that plaintiff's interpretation of the contract was unreasonable. According to the interpretation of the Board, precise dimensions were not required for the central portions of the tubular sections, and commercially available tubing which approximated the nominal dimensions would suffice. Clearly, interpretation of the contract is a question of law and, therefore, the "findings" of the Board limited to this legal question are not entitled to finality [21] under the Wunderlich Act.[22]

Thus, the circumstances of the instant case are such that the adverse decision of the ASBCA does not preclude recovery by plaintiff.

In conclusion, judgment for plaintiff is hereby entered in the amount of $42,-470.86.

21. The ASBCA, because of its conclusions regarding the merits of plaintiff's claims, did not reach the question of additional costs. With regard to the matter of