**LOCKHEED AIRCRAFT COR-
PORATION**

v.

**The UNITED STATES.**

**No. 143–64.**

United States Court of Claims.

April 14, 1967.

Numa L. Smith, Jr., Washington, D. C., attorney of record, for plaintiff. Charles D. Woodruff, Corp. Counsel, Burbank, Cal., and Miller & Chevalier, Numa L. Smith, Jr. and Clarence T. Kipps, Jr., Washington, D. C., of counsel.

Manfred J. Schmidt, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COL-

LINS, SKELTON, and NICHOLS, Judges.

LARAMORE, Judge.*

█ The primary issue presented by these cross-motions for summary judgment may be easily stated: Can the Lockheed Aircraft Corporation allocate to government contracts a portion of personal property taxes which have been assessed with respect to commercial productive material and work-in-process inventories? This is an extremely difficult cost accounting problem, not because it involves a complicated fact situation, but because the standards are inconclusive. There is also a subsidiary issue of the scope of review of the administrative determination which was adverse to Lockheed.

Lockheed and the Department of the Air Force entered into three contracts for the manufacture of F–104 aircraft.[1] These were so-called fixed-price incentive type contracts, which provided for the following procedure for the determination of price. After award, Lockheed and the government were to negotiate a target contract price comprised of target costs plus a target profit. They also had to negotiate a profit rate, a sharing ratio in cost increases or decreases, and ceilings on final price and profit. At the time of completion, it was contemplated that the parties would negotiate a final price, of course less than the ceiling, which would be the total of finally negotiated costs and profit on target costs, plus or minus an incentive sharing adjustment based upon the increase or decrease of final costs versus target costs.

An example may be helpful. Lockheed and the contracting officer might initially negotiate a basic profit rate of 8 percent of target costs, a profit ceiling of 15 percent of target costs, a total contract price ceiling of 120 percent of target costs, and a sharing ratio in the

---

* The court acknowledges the helpfulness of the opinion of Trial Commissioner W. Ney Evans. However, our approach to the issues involved is somewhat different.

1. The contract designated AF–27378 was entered into on October 22, 1954. AF–33700 and AF–33701 were dated August 13, 1956 and August 28, 1956, respectively.

ultimate variance between target and final costs of 75 percent for the government and 25 percent for Lockheed. If the parties agree to a target cost of $100 and it turns out that Lockheed can hold costs to $80, the contract contemplates that Lockheed will get its initial 8 percent profit ($8) plus 25 percent of the cost saving ($5)—a total profit of $13 or 17.2 percent of final cost. The final price will be $93, computed by adding $80 of final costs to $8 of target profit and $5 of cost saving. The disincentive effect of a higher-than-forecast target cost is illustrated by assuming a final cost of $104. Lockheed's target profit will be reduced by 25 percent of the cost "dis-saving." The final contract price will be $111, computed by adding $104 of final costs to $8 of target profit less $1 of "dis-saving." This works out to a total profit of $7 which is only 6.7 percent of final cost. The ceiling is a further disincentive. If final costs exceed 120 percent of target, for example if final costs are $130, the final contract price will be $120 and Lockheed will have a $10 loss. See Nash, Incentive Contracting 8–26 (Gov't.Con.Mon. No. 7, Geo.Wash.U.1963); Thompson, The Pricing Significance of Contract Types Used in Negotiated Military Procurement, 18 Fed.B.J. 132, 133–134 (1958).

The target cost negotiations for the contracts designated AF–33700 and AF–33701 took place in January 1959. The Air Force Negotiators took the position that for 1957 and subsequent years, Lockheed could not allocate to the contracts any of the personal property taxes that were measured by the value of commercial productive material inventories and commercial work-in-process inventories.

The contracting officer finalized this by issuing determinations which disallowed the taxes as a cost of performance. An identical position was taken in the total (final) contract cost negotiations for the AF–27378 contract in April 1959. The contracting officer for that contract refused to allow allocation of the taxes for 1958, although he allowed the allocation for 1954 through 1957. The Air Force policy change was precipitated by a decision of the Supreme Court of California, in which it was held that Los Angeles area defense contractors could recover county and city *ad valorem* personal property taxes which had been levied on productive material and work-in-process inventories to which the contractors had possession and the United States government held title.[2] General Dynamics Corp. v. County of Los Angeles, 51 Cal.2d 59, 330 P.2d 794 (Sup. Ct.Cal.1958). The theory of the case was that the California legislature did not provide for the taxation of possessory interests in tax-exempt United States government property, although it was not prohibited from doing so by either its own or the United States Constitution. The Air Force negotiators and the contracting officer construed this as a kind of immunity, and accordingly decided that the accounting provisions of the contracts should not be interpreted in a manner that would indirectly defeat the government's immunity. The Armed Services Board of Contract Appeals (AS BCA) agreed, and sustained the contracting officer's determinations on appeal.

The taxes in question were tangible personal property taxes measured by the value of the property. They were authorized generally by the California con-

2. In the years immediately preceding the decision of the California Supreme Court, the localities assessed the tax on both government and commercial property, and the government did not object to allocation of the cost. To assure that it would share in any refund resulting from the litigation in the state courts, it required the inclusion of clauses in the contracts in issue which would provide for an equitable adjustment. (Clause B 13 of AF–33700, incorporated by reference in AF–33701, and Supplement No. 15 of AF–27378.) The government argues this clause requires "that the overhead account be changed not only to eliminate the illegal tax but also to make any other change the new taxing situation demanded." We think this clause adds nothing to the present issue which comes to us through the "Disputes Clause" route.

stitution and specifically by the California Revenue and Taxation Code (section 201), and levied by counties, cities, school districts, and other local political subdivisions. Here the taxing authorities were the City of Burbank, the Burbank School District and the County of Los Angeles. Lockheed's principal office and the facilities used for the performance of the contracts in issue were located in those jurisdictions. The mechanics of the tax were the following: All personal property was assessed every year at noon on the first Monday in March. The resulting appraised values were then grossed-up for the entire jurisdiction and divided into the projected revenue requirement figure to produce a quotient which was the percentage rate to be applied to appraised value. The tax was then assessed and paid for the one-year period commencing on the following July 1. The parties have stipulated that the taxes in issue were used by these jurisdictions "as a principal source of support for community services, such as flood control, civil defense, fire department, health services, police protection, public works, refuse collection and disposal, street lighting and maintenance, traffic control, sewer maintenance, air pollution control, coroner, county library, county counsel, district attorney, forester and fire warden, administration of justice, health department, parks and recreation, and schools." There is no dispute that these services benefited the business as a whole, and that the essential services, such as fire and police protection and sewage disposal, were obtained more economically as community services than if they had been obtained from private contractors.

Lockheed allocated these taxes to both commercial and government work in the same manner as other indirect costs. It placed the taxes in a so-called factory overhead pool. It then divided the dollar value of the pool by the total number of direct factory labor hours expended on all work to establish a rate of overhead per hour. The amount of overhead per contract was calculated simply by multiplying the number of direct labor hours

put into the contract by the hourly rate. This was an accepted method of allocating costs and had been consistently used by Lockheed to allocate such overhead items as the franchise tax and plant security costs. From 1941 to 1959, the government allowed Lockheed to include in the pool the presently disputed taxes, which in the early years (as in the years after the Supreme Court of California's decision) were based solely on commercial inventories, and in the interim years were based on both commercial and government inventories.

## I

■■ Plaintiff filed a petition in this court on May 25, 1964, alleging that the February 3, 1964 decision of the ASBCA was not final and conclusive because the issues in the case were questions of law which it had decided erroneously, or alternatively, because the decision on questions of fact was arbitrary, capricious, and not supported by substantial evidence. In its motion for summary judgment and accompanying brief, plaintiff identified the questions of law as the interpretation of the contract terms "target costs" and "total contract costs" in the light of the accounting standards in the contracts, or in the alternative, the interpretation of these terms in the light of the intention of the parties at the time of contract formation. Plaintiff stated that either issue could be resolved on the facts that had been stipulated before the Board, although for the alternative approach, the Board's view of the facts would have to be reversed as unsupported by substantial evidence. Defendant responded with a cross-motion for summary judgment. In its accompanying brief it agreed the facts were "for the most part uncontested," but urged strongly that the primary issue was an accounting problem presenting "predominantly a question of fact" so that the Board's decision should be final and conclusive.

At this stage in the proceedings, the court referred the case to Trial Commissioner Evans under Rule 54(b). He submitted an opinion and recommended

conclusion of law which held for plaintiff. He dwelled extensively on the fact-law problem, ultimately concluding that the primary issue was a question of contract interpretation and an issue of law. We adopt this conclusion in a somewhat different and less extensive analysis.

Each contract contained cost provisions for the determination of target and final costs and a so-called "Disputes" clause for the resolution of questions of fact. There was a cross-reference from the former to the latter. Thus, "[f]ailure to agree [in the negotiations concerning target costs, target profits, target prices, profit and price adjustment formula, price and profit ceilings, and the adjusted total contract cost] shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled 'Disputes.'" The present dispute could have been put to the contracting officer, and the Board on review, under this provision. In fact, however, the parties used another route. In amendments to the contracts, they provided that personal property taxes based on commercial work and inventories would be excluded from the target cost, but that the correctness of this determination was in dispute, and that Lockheed, accordingly, had the right "to demand and receive promptly a written determination under the 'Disputes' article." [3]

There is no question then that the accounting issue, whether primarily an issue of law, or fact, or a mixture of both, was properly within the contracting officer's, and later the Board's, jurisdiction. In this respect, the proceeding was akin to those cases in which a contractor seeks an equitable adjustment under a "Changes" clause. The primary question may be one of law, but it can be decided by the Board because it arises under the contract—i. e., the parties bargained to resolve it administratively. Morrison-Knudsen Co. v. United States, 345 F.2d 833, 837, 170 Ct.Cl. 757, 763 (1965). See United States v. Utah Construction Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). Of course, contractors cannot bargain away their right to full-scale judicial review of administrative decisions on questions of law. The statute is express. 41 U.S.C. § 322 (1964 Ed.). So nothing in the contract can transform what is law into fact for purposes of short-circuiting review. With respect to the present case, this means that neither the cross-reference to the "Disputes" clause contained in the cost determination provisions, nor the supplemental agreements, converted the accounting issue into a question of fact.

Is the accounting issue a question of fact independent of the contract provisions relating to cost determination and disputes? If it is, our review is limited by the Wunderlich Act standards. 41 U.S.C. § 321 (1964 Ed.). The defendant takes the position that accounting problems and costing principles are necessarily factual. This point is superficially valid. It is obvious, in the abstract, that the proper way of accounting for a particular item cannot be resolved without looking at industry practice generally and perhaps alternative methods that produce reasonable results. These are factual inquiries. But the present accounting problem cannot be resolved in the abstract. The contract sets out the accounting rules (albeit vague), and their application to the particular problem raises an issue of contract interpretation which is an issue of law. This may be independently determined by the court. United States Steel Corp. v. United States, 177 Ct.Cl. ——, 367 F.2d 399, 409 (1966); See Thompson Ramo Woolridge, Inc. v. United States, 175 Ct.Cl. 527, 543, 361 F.2d 222, 233 (1966); Kings Electronics Co. v. United States, 341 F. 2d 632, 640–641, 169 Ct.Cl. 433, 446–447 (1965); River Constr. Corp. v. United States, 159 Ct.Cl. 254, 262 (1962). Thus, the ultimate question is one of law, though facts are essential to its solution. The Board's findings on these facts are entitled to finality under Wunderlich Act standards, of course, but that does not pose a problem here because the facts

---

**3.** Supplemental Agreement No. 51 to AF–27378; No. 32 to AF–33700; No. 29 to AF–33701.

are essentially undisputed, except on plaintiff's alternative theory that the parties intended at the time of formation to allow these costs. We do not reach this alternative.

## II

*A.* The "Fixed Price Incentive Clause" gives the sole clue to cost allowability under the contracts.[4] It suggests that the standard of allowability is "generally accepted accounting principles and practices." (See ¶ (5) in n. 4, supra.) Lockheed was required to submit "a statement of all costs" with supporting data. The supporting data— *i. e.,* "books, records, documents and other evidence pertaining to the costs and expenses of this contract" had to be maintained "in accordance with generally accepted accounting principles and practices to the extent \* \* \* *necessary for the establishment of costs* applicable to the items of this contract subject to price revision." (Emphasis added.) Further, Lockheed was required to certify that its records met the above standard "and practices normally fol

---

4. Each contract contained a "Fixed Price Incentive Clause" which defined contract "cost" and set out a procedure for its determination. The parties have stipulated that the following provisions from the contract designated AF–33700 are essentially the same as those contained in the other two contracts:

"(1) Definitions. As used in this clause, the following terms shall have the meanings set forth below:

\* \* \* \* \* \*

"(h) The term 'adjusted total contract cost' means the total cost, determined in accordance with paragraph (9) (i) of this clause, \* \* \*.

\* \* \* \* \* \*

"(3) Submission of Data for Establishment of Target Price and Incentive Formula. \* \* \* Not later than six months prior to delivery of the first aircraft under this contract, or at such other time as the contracting officer may direct, the contractor shall forward to the contracting officer (i) a statement of all costs, itemized so far as is practical in the manner prescribed by DD Form 784 incurred to the date of such (delivery) (shop completion) or such other time as directed by the contracting officer under this contract, (ii) an estimate of costs to be incurred by the contractor to complete performance of all work and obligations under items subject to price revision, and (iii) data to support the accuracy and reliability of such estimate.

"(4) Submission of Data for Final Price Revision. \* \* \* the contractor shall forward to the contracting officer \* \* (i) a statement of all costs itemized so far as is practical in the manner prescribed by DD Form 784 incurred by the contractor in performing all work under the items of this contract subject to price revision, \* \* \*.

"(5) Accounting Procedures. The contractor agrees to maintain books, records, documents, and other evidence pertaining to the costs and expenses of this contract, in accordance with generally accepted accounting principles and practices to the extent and in such detail as is necessary for the establishment of costs applicable to the items of this contract subject to price revision. \* \* \*

"(6) Certification. An officer or other responsible official of the contractor authorized by it to do so, shall certify on each statement of costs forwarded to the contracting officer in accordance with the requirements of this clause, that the incurred costs are based upon the accounting records of the contractor, that such records have been kept in accordance with generally accepted accounting principles and practices normally followed by the contractor, that such incurred costs are correct to the best of his knowledge and belief and that the estimate of costs to complete is considered reasonable.

"(7) Establishment of Target Price and Incentive Formula. \* \* \* Upon submission of the information required by paragraph (3) above, the contractor and the contracting officer shall promptly negotiate and amend the contract to establish the target costs, target profits, target prices, profit and price adjustment formula, and price and profit ceilings. \* \*

\* \* \* \* \* \*

"(9) Final Price Revision. Upon submission of the information required by paragraph (4) above, the contractor and the contracting officer shall promptly establish a final contract price for the items subject to revision in accordance with the provisions of this clause in the following manner: (i) on the basis of the information required by paragraph (4) above, together with the results of such other investigation, as the contracting officer may deem appropriate, there shall be established by negotiation the adjusted total contract costs, \* \* \*."

lowed by the contractor," and "that such incurred costs [were] correct to the best of his [the Lockheed officer responsible for certifying company records] knowledge and belief."

■ This standard would be very helpful if it provided a simple answer. Regrettably its vagueness prevents that result.[5] Here plaintiff's expert witness, a CPA, testified that Lockheed's method was consistent with accepted accounting practice. Defendant's expert, the resident Air Force auditor at Lockheed's Burbank plant, testified that what might be a generally accepted accounting principle for product-pricing in a commercial business should not be carried over to contract-pricing in a mixed government and commercial business. We have no doubt additional witnesses could be produced to offer cumulative testimony on each side, only to leave the issue in deadlock. Accordingly, we must look beyond the standard itself to determine how it should be applied.

Plaintiff urges us to look to the "Cost Principles" section of the Armed Services Procurement Regulations (ASPR) for the answer. ASPR Section XV, CCH Gov't.Con.Rep. ¶ 34,901 (1965). Plaintiff concedes section XV is neither part of the present contracts, nor incorporated by reference. It would have to concede as well, that the provisions it urges us to examine for guidance were promulgated in 1960 and, therefore, were not in effect during the performance period of the contracts before us, and, additionally, that in 1962 a revision was made to disallow as a government contract cost precisely the kind of tax involved here.[6] These factors might appear to undermine the value of the ASPR as a guideline in this case. However, there are certain competing considerations that militate in favor of using section XV as an aid, and these outweigh the objections.

The ASPR, in general, and "Cost Principles" section in particular, are not liberal; they forbid allocation to government contracts of some true costs of doing business.[7] The strictness is attributable to the history of military procurement. During World War II, cost-plus-a-fixed-fee (CPFF) contracting was very common. The typical CPFF contract reimburses a contractor for his total allowable costs incurred in performing the contract, and gives him a profit computed as a percentage of estimated cost. The profit figure is established at the outset, hence is appropriately called a "fixed fee." Only the cost can vary, and it can vary substantially. Standards were developed to be used by contracting officers in determining what costs should be allowed. During the war, the two most widely used cost standards were section 26.9 of Treasury Decision 5000, 1940-2 Cum.Bull. 397, and the so-called "Green Book" which was entitled "Explanation of Principles for Determination of Costs Under Government Contracts." See United States Steel Corp. v. United States, 177 Ct.Cl. ——, ——, 367 F.2d 399, 410-411 (1966); Note: Determination of Cost in Military Procurement Cost-Plus-A-Fixed-Fee Contracts, 65 Harv.L.Rev. 1035, 1036 (1952). Treasury Decision 5000 was originally promulgated to provide a standard for measuring costs in excess profits computations under the Vinson-Trammel Act, 48 Stat. 503, 505 (1934), as amended, 10 U.S.C. § 7300 (1964 Ed.), and was not ideally suited to procurement purposes. The Green Book, which had its origins in T.D. 5000, was designed for procurement, but was apparently not interpreted uniformly by the services. 65 Harv.L.Rev.,

5. As we noted in United States Steel Corp., supra, 367 F.2d at 409, one must be cautious in using "generally accepted accounting principles" as an aid in determining the allocability of costs to government contracts. Such principles have been developed for asset valuation and income measurement, and "are not cost accounting principles" as such, although "cost

accounting concepts * * * [may] evolve out of" them. Wright, Accounting for Defense Contracts 29 (1962). See Wright, The Theory of Cost Principles, 18 Fed.B.J. 165, 169 (1958).

6. Section 15-205.41(a) (v).

7. See the selected cost items under section 15-205.

supra, at 1036. Pressure developed after the war to develop uniform cost standards for cost-reimbursement contracts. The result was section XV of the Armed Services Procurement Regulations which were promulgated on March 1, 1949 under the Armed Services Procurement Act of 1947, 62 Stat. 21, as amended, 10 U.S. C. §§ 2301–2314 (1964 Ed.).

■ When the first draft of the ASPR was circulated for public comment, the industry vigorously objected to the proposed application of the ASPR to "all types of agreements and orders for procurement of supplies and services." Universal application of such strict principles was particularly repugnant to those contractors who had fixed-price incentive type contracts. As should be apparent from the outline of the dynamics of the fixed-price incentive contracts involved in this case, (see earlier discussion.) the purpose of the scheme is to encourage the contractor to pare costs down to the bare minimum. The carrot is the percentage participation in cost savings; the stick is the percentage participation in or penalty for costs deviating from estimates. In fact, this concept was specifically developed to correct the deficiencies of CPFF contracting. Braucher, Fixed Prices and Price Redetermination in Defense Contracts, 53 Col.L.Rev. 936, 939–942 (1953); 65 Harv.L.Rev. 1035 (1952). So, the industry felt the extra strictures developed to police cost-loading in CPFF contracts were not necessary where there were alternate controls. The Armed Services recognized the validity of this objection in 1949, and accordingly limited application of section XV to cost-reimbursement contracts. See Bellows, Cost Principles in Industry, 18 Fed.B.J. 175,

176 (1958); Cibinic, Cost Determination 13–16 (Gov't.Con.Mon. No. 8, Geo.Wash. U.1964).

Even though the same safeguards were not necessary for policing fixed-price incentive type contracts, it was the practice of contracting officers to use section XV as a guide in negotiations. Thompson, The Pricing Significance of Contract Types Used in Negotiated Military Procurement, 18 Fed.B.J. 132, 134 (1958). And in 1956, when the Department of Defense decided to write a more comprehensive set of cost principles, it decided to extend application beyond the cost-reimbursement contract area. Again, the industry opposed such a step. 18 Feb.B.J., supra, at 178–182. The Department of Defense prevailed, and in a new section XV promulgated on November 2, 1959, it extended application beyond the "negotiation and administration of cost-reimbursement type contracts" to "certain negotiated fixed-price type contracts," but limited application to the latter to a "guideline" function. Section 15–000. See Government Contracts Monograph No. 8, supra, at 14–16.

■ In the present case, we have the perhaps unusual situation in which a fixed-price incentive type contractor finds it to his advantage to rely on the accounting rules his industry has generally opposed. We think this should be permitted because section XV is a composite of sound accounting rules (in the usual government view), and the only reason to bar its application might be the contractor's objection, which is of course not the difficulty here.

■ *B.* The criterion in the ASPR for allocating indirect costs is "benefit." [8]

8. Sections 15–201 and 15–203 of the "Cost Principles" promulgated on November 2, 1959, and made effective on July 1, 1960, provide in pertinent part:
  "15–201.1 *Composition of Total Cost.* The total cost of a contract is the sum of the allowable direct and indirect costs allocable to the contract * * *. In ascertaining what constitutes costs, any

generally accepted method of determining or estimating costs that is equitable under the circumstances may be used * * *.
  "15–201.2 *Factors Affecting Allowability of Costs.* Factors to be considered in determining the allowability of individual items of cost include (i) reasonableness, (ii) allocability, (iii) application of those generally accepted accounting prin-

This is explicit in paragraph (ii) of section 15–201.4, and implicit in paragraph (iii). It is a kind of common sense approach to allocation. No one would quarrel with the general proposition that it is fair to allocate to government contracts the costs of services which facilitate performance of the particular contracts or are essential to the existence and continuance of the business entity. But the burden will be on the contractor to show the benefit and a reasonable allocation among different government contracts and between government and commercial work generally. A few cases illustrate the benefit approach and the degree of persuasion necessary for its application.

Pressed Steel Car Company, Inc. v. United States, 157 F.Supp. 950, 141 Ct.Cl. 318 cert. denied, 356 U.S. 967, 78 S.Ct. 1007, 2 L.Ed.2d 1074 (1958), made no explicit reference to benefit, but the notion behind the benefit concept was implicit in its reasoning. There, the plaintiff claimed reimbursement under a CPFF contract for a portion of the Pennsylvania Capital Stock Tax. Plaintiff was a Pennsylvania corporation which operated plants in both Pennsylvania and Illinois. The capital stock tax in issue was based solely on activities and property located in Pennsylvania. The court held that the contract's cost-reimbursement clause, which provided for the allocation of "the proper proportion of any indirect costs * * * incident to and necessary for the performance of this contract," did not permit allocation of the Pennsylvania tax

to the contract because the contract was performed at the contractor's Illinois plant which was excluded from the tax base. The court reasoned the contractor's Pennsylvania activities "had no relation to the performance of the plaintiff's contract with the Government, or the cost of that performance" so that it was inconceivable that "if the parties, in negotiating the terms of the contract, * * * had analyzed the nature and operation of the Pennsylvania Capital Stock Tax, they would have agreed that it should be a reimbursable cost of the performance of the Illinois contract." 157 F.Supp. at 954; 141 Ct.Cl. at 321. In response to the contractor's argument that the tax "was of the nature of a franchise tax, the payment of which was necessary to preserve the plaintiff's corporate existence," the court observed, "[t]he tax statute does not so indicate * * * [—] [i]t is not a franchise tax." Ibid. The inference is that had the tax been like a franchise tax, the allocation would have been permissible. In that case it would have had "relation to the performance of the contract with the Government," because it would have been a *sine qua non* of doing business as a corporation. The requirement of relatedness is equivalent to benefit.

In DeLong . v. United States, 175 F. Supp. 169, 146 Ct.Cl. 289 (1959), the issue was whether a contractor could recover as an overhead cost the expenses of cancelling a lease. The CPFF contract in issue related to the construction of steel

ciples and practices appropriate to the particular circumstances * * *.
 * * * * * *
"15–201.4 *Definition of Allocability*. A cost is allocable if it is assignable or chargeable to a particular cost objective, such as a contract, product, product line, process, or class of customer or activity, in accordance with the relative benefits received or other equitable relationship. Subject to the foregoing a cost is allocable to a Government contract if it—
 * * * * * *
"(ii) benefits both the contract and other work, or both Government work and other work, and can be distributed to them in reasonable proportion to the benefits received; or

"(iii) is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown.
 * * * * * *
"15–203 *Indirect Costs*.
"(a) An indirect cost is one which, because of its incurrence for common or joint objectives, is not readily subject to treatment as a direct cost. * * *
"(b) Indirect costs shall be accumulated by logical cost groupings with due consideration of the reasons for incurring the costs. Each grouping should be determined so as to permit distribution of the grouping on the basis of the benefits accruing to the several cost objectives. * * *."

barges. The barges originally contemplated were of such size that they could be built in only one shipyard, and the award of the contract was contingent upon the contractor's having arranged to use this yard. The plaintiff there leased the yard, but cancelled the lease after the government amended the contract to require smaller barges. The smaller barges were produced in smaller yards and at a lower cost than they could have been in the special yard. The court held that the costs were allowable because they were "incurred incident to the performance of the contract * * * [—in] fact, there would have been no contract had plaintiff not successfully followed the Government's instructions to acquire * * * [the yard]." 175 F.Supp., at 175, 146 Ct.Cl. at 297. It then observed that the fact the yard was never used should not militate against allowability— " * * * the change in shipyards was to the benefit of the Government and resulted in a substantial reduction in the fixed fee." 175 F.Supp. at 175, 146 Ct. Cl. at 298. This had the effect of charging the costs to the beneficiary.

The *United States Steel* case raised more difficult cost accounting problems. In issue was the propriety of charging wartime CPFF shipbuilding contracts with amounts paid during the contract period to pensioners (directly or by funding schemes) for past services. The plaintiff argued the costs were "incident to" the contracts, and therefore allowable because "past service pension costs are incurred in contemplation of a beneficial effect on the quality of an organization's present and future services." 367 F.2d at 405. We decided plaintiff could not be reimbursed for "past service" pension costs incurred under two funding schemes. We allowed reimbursement, however, of some "past service" pension costs determined under the "pay-as-you-go" system which the company had discontinued. Our reasoning was that his-

tory was on plaintiff's side; the "pay-as-you-go" system was reasonable and had been consistently used by plaintiff and others. As such, it was "a proper basis for holding that the costs are 'incident to and necessary for' performance." 367 F. 2d at 415. We noted recovery should not be barred by the fact that the cash disbursements or "pay-as-you-go" method related to past services, because it "was simply the formula for determining, each year, the pension costs borne by the company in that period, and a much easier way than trying to decide the pure 'current service' costs for the period." 367 F.2d at 416. This may seem unrelated to "benefit," but that is because benefit is implicit in the allowability of the "pay-as-you-go" method—*i. e.*, pension costs, like salary costs, are part of the employee compensation system, which *a fortiori* "benefits" any contract requiring employees' services.

*C.* In the present case, the parties have stipulated that the government contracts were benefited by the community services for which the personal property tax was levied.[9] This the Board recognized; however, it concluded that Lockheed could not establish the necessary "correspondence" between the tax payment on the one hand and the purchase price for *essential services* on the other." (Emphasis added.) ASBCA slip op., at p. 13. As a step in its conclusion, it noted "the tax support" covered more than the fire and police protection and water and sewage services that would demonstrably benefit the F–104 contracts. It felt the benefits of the so-called "residuum" group[10] were too remote, so that the whole tax payment was "not commensurate with benefit." Ibid. The plaintiff takes a broad view of benefit, the Board and defendant, a narrow. On the facts before us, we think the broad view is correct.

"Benefit" is an extremely slippery concept as the Board's decision

9. Stipulation number 5 states: "These are all services [the group listed earlier in this opinion] which benefit appellant's [Lockheed's] business as a whole."

10. *E. g.*, health services, traffic control, air pollution control, coroner, county library, county counsel, district attorney, etc.

shows. In an effort to make it analytically manageable, we reviewed in subpart *B*, supra, some cases in which benefit was a factor—perhaps silent. The principle that emerges from these cases, and the commentators,[11] is that the requirement of "benefit" may have a more or less general scope depending upon the type of expense. Also, the scope may be conditioned by policy considerations. Section XV of the ASPR is consistent with this, and certain of its language should help illustrate the point. It allows allocation if the cost "benefits both the contract and other work" or "is necessary to the overall operation of the business." These conditions are in the disjunctive, but for certain costs, they feed back and should be read as complementing each other. For example—franchise taxes are necessary to the overall operation of the business if their payment is a prerequisite to "doing business". The obvious benefit results from this fact. Additionally, as a matter of policy, it is fair to spread such a tax around to all customers. See Pressed Steel Car Co. v. United States, supra. But see, Federal Cartridge Corp. v. United States, 77 F.Supp. 380, 111 Ct.Cl. 372 (1948). In a different way, pensions are necessary to the overall operation of some businesses. Again, benefit follows from the broad necessity, and no burden is imposed on the contractor to prove a specific relationship to the contract. The same policy considerations obtain. See United States Steel Corp. v. United States, supra; 65 Harv.L.Rev., supra, at 1040. By contrast, the scope of benefit is less general where the expense is unrelated to the overall business. The contractor must show a more direct relationship in these cases. See DeLong v. United States, supra.

We are persuaded that this is a case in which "benefit" has a general scope and that sufficient benefit has been shown. We also think policy considerations favor this result. The "cost" of the California personal property tax was necessary to the overall operation of Lockheed's business in Burbank, California. It was not, perhaps, exactly like the typical franchise tax, payment of which is an absolute prerequisite to "doing business." However, it was really very close; it was the price of membership in that community. The benefits flowed to government contracts on two levels. In a general way, they were benefited by the very fact that Lockheed was meeting its responsibilities as a corporate citizen in the Burbank community. Specifically, they were benefited by the services provided by the community. It seems to us that accounting practice, as suggested by section XV of the ASPR and as recommended by Lockheed's accountant, favors allocation of such a cost to all beneficiaries "across-the-board." And, assuming a proper allocation, this produces a fair and reasonable result.

We recognize certain pitfalls in this approach, and address ourselves below to the ones cited by the Board and defendant. At this point we consider another which could come about through a misreading of our analysis. We are not saying that any expenditure "necessary" to a business generally, and therefore beneficial to all output, should be allocated to government contracts. There are some costs, for example advertising to establish a good image to attract talented employees, or charitable contributions, that may be "necessary" in a sense, and that may benefit all work. Yet allocation may be denied because the necessity and benefit are too remote. We are saying that necessity and benefit may have a somewhat different meaning for certain kinds of costs both as a matter of logic and policy. This may be an extremely limited area. In the present situation, we attribute much significance to the fact that the challenged cost was a tax. It happens that this tax was a local tax, levied to cover community costs. Payment was not voluntary. These factors put it in a

11. *E. g.*, Braucher & Hardee, Cost-Reimbursement Contracts With the United States, 5 Stan.L.Rev. 4 (1952); Gov't Con.Mon. No. 8, supra, at 6467; 65 Harv. L.Rev., supra, at 1040.

different category from charitable contributions, image-building or public relations expenses, and perhaps some other taxes. This distinction should illustrate that our approach does not lead to any general rule or litmus paper test for allocability.

*D.* The defendant argues that the benefit concept of allocation is operative only where it is possible to distribute the cost "in reasonable proportion to the benefits received," and that plaintiff cannot meet that test here. See ASPR section 15–201.4(ii). This argument is supported by the Board's conclusion that Lockheed failed to establish the necessary "correspondence between the tax payment on the one hand and the purchase price for *essential services* on the other." (Emphasis added.) ASBCA slip op. at p. 13.

▇ Plaintiff does not challenge this conclusion now or suggest that it could meet defendant's test. In fact, in oral argument, the parties appeared to agree that it would be impossible to fractionate the tax cost for purposes of determining the "purchase prices" of the various "benefits" or community services. Plaintiff argues instead that the test of allocability is different, and that it met the correct test. We agree.

Under our analysis, the distribution of cost in proportion to benefit does not present the problem identified by defendant and the Board. This follows from a broad view of benefit in the context of this case. Plaintiff has demonstrated that the tax cost was necessary to its business in Burbank, and that defendant's contracts benefited *equally* with commercial business from this fact, and more specifically, from the services which the tax payment represented. Viewed in this light, the requirement of "distribution according to benefit" is satisfied by any sound method of arbi-

trarily allocating indirect costs to commercial and government work. Lockheed placed the full personal property tax in a factory overhead pool (comprised of many costs) and allocated the entire pool to all government and commercial contracts in proportion to the direct labor hours expended on each contract as a percent of total factory labor hours. This method is well-recognized as being reasonable where direct charging is impractical, and neither the Board nor defendant has suggested otherwise.[12]  See Gov't Con.Mon. No. 8, supra, at 54–58.

▇ A more compelling argument, and the one that makes this case so troublesome, is defendant's argument that it would not have to bear any of the personal property tax "but-for" plaintiff's commercial business which served as the only base for the tax. On its face, this is a completely reasonable proposition which cuts deeply into the benefit concept of allocation. Put simply, it seems reasonable to relieve the government of the charge for admitted benefits, if those benefits would be enjoyed without charge absent commercial business. Plaintiff concedes this argument is appealing, but urges us to look beneath its superficial appeal to the underlying premise that Lockheed (and indirectly all government contracts) would be spared the tax if there were no commercial business. It argues this premise does not square with reality.

It is probable that if Lockheed worked only on government business in Burbank, the taxing authorities would find another way to tax it for its share of community services.[13]  Alternatively, the community might refuse to provide the services, thereby forcing Lockheed to provide its own. The government contracts would have to bear the cost in either case.[14]  However, this alleged reality is speculation and an insufficient basis for a judi-

---

12. Of course, the defendant seeks to exclude the personal property tax from the pool, but this is not a criticism of the method.

13. This follows from the fact that Lockheed pays about 25 percent of the total revenue

collected by the City of Burbank through personal and real property taxes. It is the largest taxpayer in the city.

14. This has been stipulated.

**798**

cial opinion. Another reason for rejecting this analysis is that it turns largely on the facts of this case and may not have general application. Lockheed is a very major factor in the Burbank community and simply has to carry its own weight. It is not so clear that the community would change its system to alternatively tax or deny benefits to a small organization that worked on government business only. Thus, for analytical purposes, the premises of the "but-for" argument must be accepted. The conclusion can be escaped only by looking beyond the tax base.

In determining whether the tax base should be determinative, the scope of the benefit concept again becomes important, for if benefit is given a broad scope, and the facts suggest the questioned cost has produced an overall benefit, the manner in which the cost was incurred may be irrelevant. 65 Harv.L.Rev., supra, at 1041. This approach would not seem to violate any accounting precepts. It looks to the fact of benefit, and allocates the cost so that no one gets "something for nothing," unless, of course, there is some reason for such a result. The benefit concept in the present context has been given a broad scope because of the relationship of the personal property tax to Lockheed's overall business in Burbank and of the community services to the govern-

ment contracts. In this sense, the California personal property tax may be analogized to a franchise tax levied on only one aspect of a business. The *Pressed Steel* case helps illustrate the point. It was suggested there that if the Pennsylvania Capital Stock Tax, which was based solely on Pennsylvania activities, had been a franchise tax, it could have been charged to government contracts performed in Illinois. 157 F.Supp. at 954, 141 Ct.Cl. at 321. As in the present case, this view could be susceptible to a "but-for" challenge; the government might well argue that its Illinois contracts would not have to be charged for any tax "but-for" unrelated activities in Pennsylvania—or, alternatively, that it should not be charged more than the minimum amount necessary to maintain the franchise in Pennsylvania. But, the "but-for" argument would not prevail because the cost, *regardless of base*, would be necessary to the existence of the business entity and would benefit all work equally.[15]

The tax base would assume an altogether different status if it were intentionally discriminatory. Thus, in the hypothetical based on the *Pressed Steel* case, the government contracts performed in Illinois would not have to share the cost of a Pennsylvania franchise tax if there were some indication that the Penn-

---

15. Lockheed makes a similar argument with respect to the California franchise tax which is based on net income from all sources. From 1957 through 1960, it paid a total amount of over $1,800,000. In accordance with its regular accounting practice, it allocated this amount through the overhead pool among government and commercial contracts. Of the total, government contracts bore about $900,000. In fact, however, the commercial business produced no profit during this period, yet it bore roughly half the tax burden. Plaintiff points out that "but-for" the government business, the commercial business would not have had to bear any tax burden and would have enjoyed the full benefit. This is, of course, analogous to the argument the government makes with respect to the personal property tax.

The defendant's "but-for" argument is somewhat stronger, because the taxing system of the state has recognized a dichotomy between government and commercial property in defining the tax base. By contrast, the taxing system does not distinguish between sources of net income for purposes of the franchise tax, although that tax is in effect based only on the business which produces income. Notwithstanding this distinction, plaintiff's argument is helpful in demonstrating that there are certain costs which, though attributable to a particular activity, may be spread over all activities. This would have to be qualified by any special factors that would preclude universal allocation. This accords with our conclusion that the "but-for" argument can be determinative only if an across-the-board allocation (required by cost accounting principles) contravenes an announced policy. We conclude that there is no evidence of such policy.

sylvania legislature intended to immunize the United States. This would be so regardless of the benefits accruing to the government. In the present case, the Board took this position where it said: "[to disregard the assessment base] would be simply to defeat by indirection the tax immunity of Government-owned inventory." ASBCA slip op., at p. 14. The Supreme Court has made it quite clear that California could have included the government inventory and work in the personal property tax assessment base. See American Motors Corp. v. City of Kenosha, 356 U.S. 21, 78 S.Ct. 559, 2 L.Ed.2d 578 (1958); City of Detroit v. Murray Corp., 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958); United States v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); United States v. Township of Muskegon, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958). So there is no constitutional inter-governmental immunities problem. Of course, California itself might as a matter of policy choose to avoid any possible clash of sovereignties by not taxing government work, but it cannot simply be assumed that is the policy, or if it is the policy, that it would extend immunity to the secondary degree urged by defendant.

## CONCLUSION

In summary, we hold that the claim was properly within the jurisdiction of the contracting officer and the ASBCA under the "Disputes Clause," but that the ultimate issue is a question of contract interpretation, so the decision of the ASBCA is not entitled to finality. On the merits, it is our conclusion that the personal property taxes which were assessed with respect to Lockheed's commercial productive material inventories and work-in-process inventories were costs of performing the three contracts in suit and that the method of allocation was proper. Having taken this view, we find it unnecessary to reach the question of whether the parties intended (as a matter of fact) that Lockheed's method be allowed. Likewise, we do not reach the issue of whether the decision of the

ASBCA is arbitrary or not supported by substantial evidence.

Accordingly, plaintiff's motion for summary judgment is granted, and defendant's cross-motion is denied. The parties appear to agree that the amount of recovery should be $237,430.67. If this is correct, judgment should be entered for the plaintiff in that amount. If, however, the amount of recovery is in dispute, the proceedings here will have to be suspended so that the parties can return to the Armed Services Board of Contract Appeals for determination of the amount due. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).