**KMS FUSION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 649–87C.

United States Claims Court.

Dec. 4, 1991.

Timothy Sullivan, Washington, D.C., for plaintiff.

Scott Ray, with whom was Thomas W. Petersen, Asst. Director, David M. Cohen, Director, Commercial Litigation Branch and Stuart E. Gerson, Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., for defendant. Jacob Vreeland, U.S. Dept. of Energy, Washington, D.C., of counsel.

## OPINION

SMITH, Chief Judge.

This is a direct access suit under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* (1982). Plaintiff, KMS Fusion, Inc. (KMS) claims it is entitled to recover amounts allegedly due under a contract with the United States Department of Energy (DOE). KMS maintains that it is entitled to approximately $1,000,000 in indirect costs incurred in calendar years 1983 and 1984 which were improperly denied in a final decision of the contracting officer (CO).

This case comes before the court on the parties' cross-motions for summary judgment. There are six types of indirect costs in dispute. For the reasons given below, the court grants plaintiff's motion for summary judgment as to four of the cost types, grants defendant's motion for summary judgment as to one of the cost types, and denies both parties' motions as to a sixth cost type.

## FACTS

On December 22, 1981, DOE awarded KMS contract no. DE–AC08–82DP40152 to perform research and development in connection with DOE's inertial confinement fusion (ICF) program through its Nevada Operations Office. The cost plus fixed-fee contract provided for a five-year performance period beginning on January 1, 1982, and ending on December 31, 1986. The contract was later extended through April 30, 1987. The total estimated contract price was $64,430,700 which included a fixed fee of $5,055,000.

Pursuant to the contract, KMS billed DOE during the course of contract per-

formance for its direct costs (labor and material) and its indirect costs. The indirect costs usually consisted of general and administrative (G & A) and labor overhead expenses. KMS billed using interim indirect rates.[1] As soon as possible after each calendar year, KMS submitted a final indirect cost proposal based upon that year's actual overhead and G & A costs that were allocated to and allowable under the contract. These indirect rates were to be finalized after each completed year based upon audits conducted by the Defense Contract Audit Agency (DCAA).

The DCAA would audit KMS' accounts to verify the indirect cost proposal and forward an advisory audit report to DOE to be used in negotiating final indirect cost rates. Upon receiving DCAA's revised audit reports for calendar year (CY) 1983 and CY 1984, DOE proposed to disallow a total amount of $1,288,760. KMS disputed the disallowance and requested that the CO prepare a final decision on the issue. The CO's final decision disallowed a total amount of $1,059,968 in indirect costs.

Six types of disallowed indirect costs are in dispute: (1) bid and proposal (B & P) costs in excess of a formula ceiling; (2) the cost of operating a Washington, D.C., office; (3) costs related to travel by plaintiff's vice president, Mr. Terence C. Liddy; (4) the cost of retaining government affairs consultants; (5) costs incurred in marketing and installing for demonstration purposes a product called the Multiplexor; and, (6) profit realized on the sale of an option to purchase real property as a recovery of home office rental costs. Each type of indirect cost will be discussed separately.

1. The "rate" is the portion of the indirect cost which the government must pay and is based on the percentage of the overall business of the contractor a specific contract represents.

2. The issues are governed by the federal procurement regulations in effect on the effective date of the contract, January 1, 1982.

3. The DOE regulation, 41 C.F.R. § 9–15.205–3 (1981), provides:
   The cost of preparing bids or proposals shall include an amount for absorption of their appropriate share of related indirect

## DISCUSSION

### 1. Bid & Proposal Costs

For most of its history KMS has been almost wholly dependent on its inertial confinement fusion contracts with DOE. At the end of the 1970s KMS recognized that it had to expand its business base beyond the DOE contract in order to ensure its long-term survival.

The DOE encouraged KMS to diversify. Many DOE officials believed that the ICF program would benefit from KMS' participation. This participation would be jeopardized if KMS, because of its undue reliance on its ICF contract, could not withstand reductions in ICF program funds. KMS' diversification would also result in a reduction in indirect costs allocated to the DOE contract in future years.

As part of the diversification effort KMS began to implement an extensive B & P program in mid–1982. The federal procurement regulations in effect on the date of the contract award generally permit recovery of B & P expenses.[2] 41 C.F.R. § 1–15.205–3 (1981). In contrast, the DOE procurement regulations limit recovery through the application of a ceiling based on an average of the contractor's actual B & P costs for its three most recent years. 41 C.F.R. § 9–15.205–3 (1981). The regulation further provides that a different ceiling could be established by the contracting officer should application of the formula result in inequitable recovery.[3]

### Factual Dispute

KMS contends that an agreement existed between it and DOE to negotiate B & P ceilings individually for the years 1982,

costs. A contractor's bidding costs are allowable in accordance with FRP 1–15.205–3, up to a ceiling amount equal to the average annual bidding costs computed from the actual costs for the contractor's three most recent years. However, at the discretion of the Contracting Officer, a ceiling amount in excess of the foregoing may be established when the contractor can demonstrate that the three year average annual bidding cost formula would produce a clearly inequitable cost recovery.

1983, 1984, and 1985. DOE admits that it encouraged KMS to diversify and agreed not to apply a regulatory formula to limit KMS' recovery of B & P expenses for CY 1983 and CY 1984. DOE denies agreeing to negotiate individual B & P ceilings and asserts that an unpublished DOE formula controls, so that recovery is limited to an average of the most recent years available.

According to the affidavit of KMS' Director of Contracts, Robert F. McCarthy, because KMS had almost no history of B & P he contacted DOE's Contract Administrator, Rex Purcell, regarding establishment of a ceiling different from the one that would be established by the formula. A letter dated August 31, 1982 from Mr. Purcell stated that the letter was a follow-up to a discussion on August 18, 1982, and that KMS should submit a petition for cost reimbursement for B & P. On October 25, 1982, Mr. McCarthy submitted a 1982 B & P plan. A letter which accompanied the plan stated, "we propose that the reasonableness of B & P/IR & D [4] costs be negotiated with the Contracting Officer...." The total estimated for B & P for CY 1982 was $307,000.

On November 16, 1982, the acting CO, John R. Gilpin, sent a letter to KMS that stated, "... allocation base ceiling amounts for B & P and IR & D are established at $299,000 [5] and $138,000 respectively." The letter went on to say, "[i]rrespective of the above, CY 82 B & P and IR & D costs claimed by [KMS] for reimbursement under Government contracts will be subject to prior audit review and a determination of allowability in accordance with contract terms and conditions." Based on these letters and on discussions with Mr. Purcell, Mr. McCarthy understood that ceilings for B & P costs would be negotiated with the contracting officer until KMS had developed a representative base for application of the three-year formula. The actual B & P costs incurred by KMS in CY 1982 were $265,512. KMS was reimbursed for this entire amount.

On November 4, 1983, Mr. McCarthy submitted a B & P plan for CY 1983. The accompanying letter stated, "[w]e are again proposing that the reasonableness of the B & P/IR & D costs be negotiated with you." The total estimated for CY 1983 for B & P was $407,000. A letter dated March 20, 1984 from Mr. Purcell stated that, with one exception,[6] all the B & P and IR & D projects met the test of "benefit to DOE." In his affidavit Mr. McCarthy states that, based on the procedure utilized to approve the CY 1982 B & P costs and the lack of any reference to further negotiations of a B & P ceiling, he interpreted the March 20, 1984 letter as approving a B & P ceiling of $407,000.

Mr. McCarthy submitted KMS' CY 1984 B & P/IR & D plan on December 19, 1984. The letter accompanying the plan again stated, "[w]e are again proposing that the reasonableness of the B & P/IR & D costs be negotiated with you." The estimated costs for CY 1984 were $415,000. In a letter dated February 13, 1985, the CO, Daryl B. Morse, stated, "a determination has been made that the projects meet the test of 'benefit to DOE.' Therefore, no exception is taken to allocating the costs related to these B & P and IR & D projects...." According to Mr. McCarthy's affidavit and deposition testimony, based on the Morse letter, the prior procedures utilized to approve B & P costs, and the lack of any reference to further negotiations, he interpreted this letter as approving a CY 1984 B & P ceiling of $415,000.

KMS incurred $419,820 in B & P costs for CY 1983. In his final decision, issued April 14, 1987, the CO limited KMS' recovery of CY 1983 B & P costs to the amount actually incurred in CY 1982, $265,512.

---

**4.** Independent Research and Development. Reimbursement of IR & D costs is not an issue in this case.

**5.** Of the $307,000 in the proposal, $8,000 of miscellaneous costs were not approved.

**6.** On May 16, 1984, Mr. Purcell sent a letter stating that, after considering additional information and comments from KMS, the project previously rejected was now found to be of benefit to DOE; therefore no exception would be taken to including the costs associated with this project in KMS' IR & D costs allocated to DOE contracts.

For CY 1984 KMS incurred $406,297 in B & P costs. The CO limited CY 1984 B & P costs to the average of the amounts incurred in CY 1982 and CY 1983, $342,666. The CO's final decision on costs explains that, "[i]n the event the contractor did not incur B & P costs in the previous years, then it is DOE policy to use the most recent years available."

In support of its argument that an agreement existed between KMS and DOE to negotiate a ceiling, KMS offers the affidavit of Rex Purcell, the contract administrator for DOE. In his affidavit, Mr. Purcell states that the CO, DOE headquarters, and the ICF program manager all recognized the benefit to DOE if KMS were to diversify. It was deemed in the best interests of the ICF program for the government to encourage and assist KMS, as appropriate, in the broadening of its business base. Based on the above considerations and the fact that KMS had no history of B & P expenses prior to 1982, it was believed that strict application of a formula would be inappropriate. According to Mr. Purcell, it was also determined that, as permitted by the regulations, ceilings in excess of the formula would be negotiated with the contracting officer for a period not to exceed three years after which there would be a reasonable basis for application of the formula. Mr. Purcell's affidavit states that the highest officials, including the contracting officer, gave approval to negotiate.

Defendant maintains that the letters do not evidence an agreement to negotiate. Except for the letter relating to CY 1982, no mention was ever made of a ceiling amount. Defendant further questions the authority of Mr. Purcell, as the contract administrator and not the contracting officer, to make any agreements to negotiate with KMS.

### Summary Judgment

A case may be disposed of through a motion for summary judgment when there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56. When more than one claim for relief is presented in an action the court may direct the entry of final judgment as to one or more but fewer than all of the claims only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. RUSCC 54. However, the fact that both parties have simultaneously filed or cross-moved for partial or full summary judgment, and that both parties argue that there are no genuine issues of material fact in dispute, does not settle the question. The court still has the duty to determine whether there are disputes of material fact.

The court is unable to determine whether an agreement did in fact exist between the parties to negotiate a ceiling. The letters from the COs for the relevant years make no mention of a ceiling. Mr. Purcell states that the decision to negotiate was made by the proper authorities. An affidavit from Daryl B. Morse, who was the CO from the end of 1983, denies that there was an agreement to negotiate. No evidence is offered of the conversations between KMS and the acting-CO, John R. Gilpin, in 1982 and 1983.

Even if the court were to consider the undisputed evidence of the letters, more than one inference could be drawn from them. The court could accept the plaintiff's inference, that negotiations were agreed to and the CO accepted the amounts in the proposals as the ceilings. But the court could also infer that negotiations were agreed to but never occurred. Finally, the court could accept the inference proffered by the defendant that no negotiations were ever agreed to.

"Where there are undisputed facts from which different ultimate inferences might reasonably be drawn and as to which reasonable persons might differ, the case is not suitable for summary judgment." *Sankovich v. Life Insurance Company*, 638 F.2d 136 (9th Cir.1981), citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam*).

The court on this issue finds itself in the position of weighing conflicting evidence to try to ascertain the truth. A genuine issue of material fact exists, therefore, as to

whether or not an agreement existed between the parties to negotiate a ceiling for B & P costs. Therefore, this issue must be held over for trial. For the reasons set forth above, neither party prevails on this issue.[7]

### 2. Washington, D.C., Office

KMS is seeking $146,609 for salaries, fringe benefits, rent, and other costs incurred in operating and maintaining its Washington, D.C., office during CY 1983 and CY 1984. KMS has maintained an office in Washington, D.C., since 1978, two years before it was awarded its first government contract.

In CY 1983 and CY 1984 there was only one employee, Ms. Sinclair, in the Washington, D.C., office. Her principal responsibilities were to obtain information on legislation and agency programs which affected KMS' contracts or which provided a potential market for KMS' products and services. Ms. Sinclair assisted KMS in keeping Congress informed on KMS' contracts and performed administrative functions.

Her duties included accompanying the vice president or technical experts from KMS on appointments with members of Congress, their staff, and congressional committee staff. She also went to see people in Congress on her own. The purpose of these appointments was to inform Congress about KMS. She monitored legislation by picking up legislative documents at the House of Representatives document room, collecting scheduling information on hearings at the Armed Services and Appropriations Committees, and attending congressional hearings. She went to the DOE Office of Congressional Affairs to drop off work sheets or testimony. She delivered papers and proposals prepared by KMS to other agencies. She obtained documents, including requests for proposals from various agencies, and forwarded them to KMS headquarters in Ann Arbor, Michigan.

KMS does not dispute that Ms. Sinclair does not have the technical background to discuss the inertial fusion program.

KMS claims that it opened a Washington, D.C., office for business purposes related to its position as a leader in fusion technology. As discussed above, KMS had undertaken an extensive effort to diversify. KMS' efforts to diversify were focused on the federal government because of the extremely technical nature of its expertise. KMS argues that it needed timely information on the programs, policies, and future plans of its primary customer in order to remain in business. The primary function of the Washington office was to obtain this and similar types of information. Ms. Sinclair's position required a thorough knowledge of the company; the issues which affected it; and Congress, congressional committees, and the agencies with which KMS dealt, and how they function. She had to know whom to contact and the roles of various personnel. Such knowledge is gained only through daily contact with Congress and the various agencies made possible by being located in Washington. Additionally, KMS argues that filing deadlines frequently impose time constraints which mandate the use of a reliable employee to accomplish these activities. There is a significant loss of effectiveness, argues KMS, if these functions had to be performed from the home office in Michigan.

DOE contends that the principal business activities of KMS' Washington office were legislative liaison and lobbying. The government characterizes the activities of KMS' employee as lobbying and mail and delivery service and argues that the activities not fitting into those categories could have been performed from KMS' Ann Arbor, Michigan office.

In his final decision, the CO disallowed all costs associated with the Washington office for CY 1983 and CY 1984. The CO

---

**7.** The defendant raises the issue of Mr. Purcell's authority to agree to negotiation. Defendant offers evidence that Mr. Purcell's function was only to give technical direction. Plaintiff offers evidence that the CO authorized Mr. Purcell to agree to negotiate ceilings, and points to Mr. Purcell's Delegation of Authority which included the authority to approve the contractor's procedures for financial accounting functions. Because this claim will be held over for trial, the court will not address this issue at present.

determined that the legislative liaison offered no benefit to the government and, therefore, those costs were unreasonable, unnecessary, and unallowable. DOE does not point to a specific regulation which disallows costs associated with the activities of that office. Instead DOE argues that, because the predominant activities of the office were lobbying and legislative liaison, and because such activities do not benefit DOE, the costs associated with those activities and with the Washington, D.C., office are not allocable.

KMS argues that its Washington office was necessary for the overall operation of its business. Because KMS' expertise lies in highly technical areas, its primary customer is and is likely to remain the federal government. It must have timely information on government programs and policies in order to effectively engage in business planning, to determine if a market for its products exists, and to develop products and services of interest to that customer. KMS argues that this information can only be effectively obtained through the constant contact which representation in Washington provides. Additionally, in order to market its products and services, KMS must provide the government with information on its unique capabilities and products.

KMS additionally argues that the activities conducted via the Washington office provided a benefit to the government as well. Since acquisition of information on government programs and plans allowed KMS to more effectively engage in business planning, it was able to more readily respond to the government's needs. Information on KMS' programs and abilities permitted the government to more intelligently evaluate its own needs for the type of services and products plaintiff offers. Furthermore, KMS argues that any diversification would be beneficial because it would make the company less dependent on the ICF contract. As discussed previously, diversification makes the company less vulnerable to a down turn in business and reduces each customer's proportionate share of that company's indirect costs.[8]

The cost principles in effect at the time of the contract award were silent on lobbying and legislative liaison activities. However, 41 C.F.R. § 1–15.205(d) states that "[this regulation] does not cover every element of cost ... and is not intended to imply that [any item of cost not treated] is either allowable or unallowable." Additionally, 41 C.F.R. § 1–15.205(b) states that "[c]osts shall be allowed to the extent that they are reasonable, allocable, and determined to be allowed...." As to allocability, 41 C.F.R. § 1–15.201–4 provides:

A cost is allocable if it is assignable or chargeable to one or more cost objectives ... in accordance with the relative benefits received or other equitable relationship. Subject to the foregoing, a cost is allocable to a Government Contract if it:

(a) Is incurred specifically for the contract;

(b) Benefits both the contract and other work, or both Government work and other work and can be distributed to them in reasonable proportion to the benefits received; or

(c) Is necessary to the overall operations of the business, although a direct relationship to any particular cost objective cannot be shown.

Reasonableness of costs are governed by 41 C.F.R. § 1–15.201–3(c):

In determining the reasonableness of a given cost consideration shall be given to:

(c) The action that a prudent businessman would take in the circumstances, considering his responsibilities to the owners of the business, his employees, his customers, the Government, and the public at large....

DOE argues that, under the regulations, allocability requires that the activities for which the costs claimed are incurred must

---

8. KMS alternatively argues that DOE is estopped from disallowing the Washington office costs for CY 1983 and CY 1984 because DOE knew of the Washington office and allowed recovery of the costs associated with it in prior years. The disposition of these costs under the benefit analysis makes further discussion of the estoppel issue unnecessary.

result in demonstrable benefit to the government. In addition, the reasonableness of the costs must be considered to determine if the costs are not only allocable but allowable. DOE maintains that the court must determine if KMS' maintenance of the Washington office benefitted the government and secondly, if a prudent businessman would spend $146,609 over a two-year period to support one employee whose tasks were largely clerical in nature.

## Benefit Issue

█ Any discussion of benefit must begin with *Lockheed Aircraft Corporation v. United States,* 179 Ct.Cl. 545, 375 F.2d 786 (1967). In that case the Court of Claims found that a manufacturer who entered into a fixed-price, incentive-type contract with the government could allocate to the government contract a portion of personal property taxes which had been assessed with respect to commercial productive material and work-in-progress inventories.

Noting that " 'benefit' is an extremely slippery concept," the Court found that "[t]he principle that emerges from these cases, and the commentators, is that the requirement of 'benefit' may have a more or less general scope depending upon the type of expense. Also, the scope may be conditioned by policy considerations." 375 F.2d at 795, 796 (footnote omitted).

The Court of Claims dealt with an Armed Services Procurement Regulation (ASPR) similar to the regulation at issue here. The ASPR regulation allowed allocation if the cost "benefits both the contract and other work" or "is necessary to the overall operation of the business." *Id.* at 794 n. 8. The Court of Claims found that:

> [while] these conditions are in the disjunctive, ... for certain costs they feed back and should be read as complementing each other. For example franchise taxes are necessary to the overall operation of the business if their payment is a prerequisite to 'doing business.' The obvious benefit results from this fact. Additionally, as a matter of policy, it is fair to spread such a tax around to all customers.... [B]enefit flows from the broad necessity, and no burden is imposed on the contractor to prove a specific relationship to the contract. By contrast, the scope of benefit is less general where the expense is unrelated to the overall business. The contractor must show a more direct relationship in these cases.

375 F.2d at 796.

The Court in *Lockheed* felt that "benefit" had a general scope and that sufficient benefit had been shown. The Court also thought that policy considerations favored the result. The "cost" of the California personal property tax was necessary to the overall operation of Lockheed's business in Burbank. It was the price of membership in that community. The benefits flowed to government contracts on two levels. In a general way, they were benefitted by the very fact that Lockheed was meeting its responsibilities as a corporate citizen in the Burbank community. Specifically, they were benefitted by the services provided by the community. Accounting practice favors allocation of such a cost to all beneficiaries "across-the-board."

Similarly, this court finds that this case requires "benefit" to have a general scope. A company which is so highly technical and specialized in nature that it must depend on the federal government for the majority of its business is forced into the position of directing extensive efforts to ensure its livelihood by continuing to retain its present work and to obtain new business. This activity and the costs incurred are necessary to the overall operation of the business. In addition, DOE benefits both in a general way—because it has an interest in keeping KMS viable—and in a more specific way—because its share of KMS' ICF contract costs will be reduced if KMS obtains other government contracts. The whole government will also benefit, as the same cost base will support more productive activity.

## Reasonableness Issue

█ As to the reasonableness of the costs, DOE does not appear to be arguing that the approximately $146,000 was an unreasonable amount to spend over two

years for an employee's salary, fringe benefits, and office rental. Rather, DOE argues that it is unreasonable for a prudent business person to spend money on maintaining an office and employee in Washington, D.C. In support of this argument, DOE points to the fact that regulations promulgated after the effective date of the contract specifically prohibit recovery of lobbying expenses.

As the court pointed out at oral argument, if the costs were unreasonable, there would have been no need to change the regulation; the costs would always have been disallowed because of their unreasonableness. Instead, it appears to the court that costs for lobbying to obtain more business from the federal government are very reasonable. It is inherently reasonable for a company to maintain an office and staff in Washington, D.C., to obtain more business from the federal government. It is exactly the fact that this is such a reasonable expense which may have been the reason for the change in the regulation. It was too reasonable. It seems clear that the new regulation made lobbying expenses non-allocable for policy reasons, not because it was "unreasonable."

The fact that the lobbying by KMS was reasonable is evidenced by how successful it was. As has already been discussed, KMS needed to diversify. Through its lobbying efforts it was able to do that. In 1982, 94% of KMS' total contract revenues were derived from the DOE–ICF contract; in 1983, 92%; in 1984, 87%; in 1985, 82%; in 1986, 74%.

The court finds that KMS' Washington, D.C., office costs for CY 1983 and CY 1984 are allocable to the contract. They were necessary to the overall operation of the contractor's business, provided benefit to the government, and were reasonable.

Plaintiff prevails on this issue.

### 3. KMS' Vice President's Travel To Washington Office

■ The third issue is whether KMS may recover travel costs associated with the Washington, D.C., office during CY 1983 and CY 1984. The majority of the $22,725 in dispute relates to travel between Ann Arbor and Washington, D.C., by KMS' vice president, Mr. Liddy. The CO's final decision disallowed these travel expenses for insufficient documentation of the purpose of the travel.

KMS maintains that the purpose of this travel was to supervise the Washington office and that this purpose is a reasonable cost of doing business. KMS argues that since Mr. Liddy was in charge of the Washington office, he frequently was required to travel to Washington. According to Mr. Liddy's affidavit, the specific purpose of his trips was to supervise and consult with Ms. Sinclair, to attend meetings with agency officials regarding programs of interest to KMS, and to provide technical information to congressional committees. DOE argues that KMS' records demonstrate that Mr. Liddy's travel reports rarely described the business purpose of his travel to Washington. This issue is governed by 41 C.F.R. § 1–15.205–46 which provides: "[t]ravel costs incurred in the normal course of overall administration of the business are allowable and shall be treated as indirect costs."

The court finds that Mr. Liddy's travel falls within this category of "normal course of overall administration of the business." This issue is linked to the allocability of the Washington office costs addressed above. KMS' Washington office costs for CY 1983 and CY 1984 are allocable on the basis of necessity to the overall operation of the contractor's business. Since maintaining the Washington office is in the normal course of business, travel to the Washington office was also incurred in the normal course of business. No facts to the contrary have been presented.

Plaintiff prevails on this issue.

### 4. Government Affairs Consultants

■ The CO's final decision disallowed fees paid to government affairs consultants by KMS. The CO determined that the consultants' principal duties were to effect legislative change and that the services were not technical in nature. The CO found that

the costs were not allocable to the contract. Six consultants were utilized by KMS during the years at issue.

The first consultant previously worked for both NASA and the Department of Defense (DOD) and was hired by KMS to provide information regarding NASA or DOD programs providing possible markets for KMS' products and services and to provide his views on the current and long-term plans for these agencies.

The second consultant was a former administrative assistant to a United States Senator and was retained to provide KMS with information on budgetary issues involving the DOD– and the DOE–ICF programs. This consultant also was involved with legislative issues: editing and reviewing information provided to members of Congress, and arranging meetings with congressional committees.

The third consultant was a former DOD employee who provided KMS with information on government programs and activities at both the legislative and administrative level and facilitated meetings with members of Congress and congressional committee staff.

The fourth consultant was a former member of Congress who provided information to KMS on legislative initiatives, and assisted in arranging meetings between KMS officials and members of Congress and congressional committee staff.

The fifth consultant was a former DOD employee with extensive congressional contacts who provided KMS with information on congressional activities as they related to the military and also assisted in facilitating meetings with members of Congress and congressional committee staff.

The sixth consultant was a former staff member of the House Armed Services Committee who provided information on DOE's ICF program, helped educate KMS personnel on the DOE national laboratories, and furnished information on government budgetary issues.

KMS maintains that its use of government affairs consultants was motivated, in part, both by its desire to diversify its business and its almost total dependence on the government for its business. The decision to expand both inside and outside the ICF program created a need for increased information on government programs and operations to determine where KMS' expertise could best be utilized.

The principal duty of the consultants was to provide KMS with information on government programs both on the legislative and agency levels. KMS wanted this information so it could effectively engage in business planning and determine the markets for its products and services. The legislative contacts and experience of some of the consultants provided KMS with information on budget issues involving the DOD– or the DOE–ICF programs, legislative initiatives which might provide a market for KMS' products and services, and other issues of interest to KMS. The consultants helped to facilitate meetings with members of Congress and their aides in order to permit KMS to present information on its operations.

Defendant contends that the government as a whole did not benefit from the consultants because any reduction of G & A costs under the DOE contract were charged to other government contracts. The costs for their services were disallowed, according to defendant, because their sole mission was to obtain additional government business for KMS.

Classic political and economic theory often treats information about government as a free good, one having no cost. This is, perhaps unfortunately, far from the reality when dealing with today's huge and vastly complex government structure. It is not only legitimate, but almost mandatory, that businesses have a method of obtaining information about government and its activities. The court finds that the use of consultants was both a benefit to the government and necessary to KMS' business. The government benefitted in a general sense because it obtained additional information on which to base its procurement decisions. As noted earlier, the whole government also benefits, as the same cost base will support more productive activity.

To the extent that marketing efforts succeeded in developing additional business for KMS, DOE obtained a benefit specifically related to the contract because of the reduction in the indirect costs allocated to the contract. The majority of KMS' business was with the government and KMS' consultants' fees were a reasonable business expense. Moreover, it was reasonable for KMS to retain government affairs consultants in order to diversify. The costs are allocable to the contract.

Plaintiff prevails on this issue.[9]

### 5. Multiplexor Marketing And Demonstration Installation

■ The fifth issue is whether KMS is entitled to recover the costs for marketing and installing for demonstration purposes a product known as the "multiplexor" during CY 1983 and CY 1984. KMS developed the multiplexor hardware for use on the DOE contract to interface multiple computer work stations, thereby eliminating the need for an expensive video printer for each work station. KMS then decided to market the multiplexor to the government and to companies that performed government contracts.

DOE does not contend that KMS' multiplexor costs are unreasonable in amount but instead contends that these costs are not allocable to the contract. DOE maintains that the multiplexor costs should be treated as costs identified specifically with another final cost objective of the contractor. Once KMS began engaging in the business of selling multiplexor units, argues DOE, it developed a separately identifiable operation which was a final cost objective of KMS' business. The advertising and installation of multiplexor units were identified specifically with that final cost objective. This is part of what defendant calls a "total cost concept" which requires that the price a seller charges a buyer include the total costs of marketing. As direct costs of that cost objective, the multiplexor costs may not be charged to the ICF contract directly or indirectly. DOE argues that both the cost of selling a particular item and the cost of installing that item are direct costs of the sale.

The government does not dispute that where an activity benefits the contractor's entire business rather than a specific product, the costs of such activity, absent some other disqualifying factor, may be allocated to a government contract under a method of distributing overhead costs. However, argues DOE, the costs of advertising and installing the multiplexor do not benefit KMS' entire business, but go directly to the sale of a specific product.

---

**9.** The defendant raised the issue of whether the costs are retainers or fees.

41 C.F.R. § 1–15.205.31(c) applies to retainers paid to consultants and requires that allowable retainer fees must be supported by evidence that:

(1) The services covered by the retainer agreement are necessary and customary;

(2) The level of past services justifies the amount of the retainer fees (if no services were rendered, fees are not automatically unallowable); and,

(3) The retainer fee is reasonable in comparison with maintaining an in-house capability to perform the covered services, considering factors such as cost and level of expertise. If the fees are not retainers then 41 C.F.R. § 1–15.205.31(e) provides:

Except for retainers (see paragraph (c) of this section), fees for services rendered [by consultants] shall be allowable only when supported by evidence of the nature and scope of the services furnished.

Defendant argues that if the fees are not retainers, there is nothing in the record specifying the nature and scope of what services were furnished by KMS' consulting team as required by paragraph (e). Further, KMS has not offered detailed invoices, or examples of its consultants' work product to rebut the clear implication that the fees were paid as retainers.

KMS replies that this issue was not raised by the CO in his final decision and therefore cannot be raised here, and, even if it could be raised, KMS has met its burden.

The court will not address KMS' threshold defense because it is not necessary to reach the issue of whether the fees were retainers or merely consultant fees because it finds that KMS has met its burden for both. KMS has provided ample evidence of the nature and scope of the services furnished as required by paragraph (e) and has met all three requirements of paragraph (c).

In addition, KMS has raised an estoppel issue as to one consultant. In light of the court's decision as discussed above, it is not necessary to address that issue either.

KMS argues that the costs should be characterized as indirect costs and included in the G & A pool. KMS maintains that the costs are properly allocable to the contract because selling the multiplexor reduced overhead costs on the ICF contract by spreading those costs to other contracts. The purpose of incurring such costs was to acquire new customers and this was an activity which benefited the contractor's entire business rather than a specific product. Also, the record shows that all of the sales were made to the government or to companies performing government contracts. KMS argues that this is a benefit to the government. KMS also argues that allocating part of the direct costs of selling and installing the multiplexor to the government will enable it to increase its business and, because these costs are inherent in increasing business, they benefit the government by enhancing the prospects for continued life of a government supplier and therefore are allocable.

If this argument were adopted by the court, defendant maintains, it would enable any government supplier to improve its private sector competitive position by shifting a portion of the costs of doing private business to the government. The alleged benefit to the government is too remote and insubstantial to justify allocating these costs to the contract and should be allocated directly to the product.

41 C.F.R. § 1–15.202(a) provides:

Costs identified specifically with the Contract are direct costs of the contract and are to be charged directly thereto. Costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives and are not to be charged to the contract directly or indirectly.

This issue is analogous to the issue in *FMC Corporation v. United States,* 853 F.2d 882 (Fed.Cir.1988). In that case the contractor was attempting to recover litigation expenses which were incurred in connection with one government contract as indirect costs allocable to other government contracts. In affirming the decision of the Armed Services Board of Contract Appeals, 87–2 B.C.A. (CCH) ¶ 19,791 at 100,133 (Apr. 30, 1987), the Federal Circuit held that the litigation expenses were not indirect costs allocable as general and administrative costs.

The Board found a direct relationship between the legal expenses associated with the TRIDENT claim and the TRIDENT purchase order. Such expenses, said the Board, were incurred to recover amounts believed due under the purchase order and FMC recorded the settlement of its claim on its books as income to that order. According to the Board, because the claim expenses were incurred specifically for, and could be identified specifically with, the TRIDENT purchase order, they were not indirect costs under the ASPR definitions.

FMC argued that the legal costs should be allocable to non-TRIDENT contracts because they meet the requirements of 32 C.F.R. § 15–201.4(iii) of a cost which is "necessary to the overall operation of the [contractor's] business." The Federal Circuit stated: "Although not an explicit requirement of the regulation, that provision has been interpreted to require the contractor to show in addition a 'benefit' from the expenditure to government work." 853 F.2d at 885–86, citing *Lockheed,* 375 F.2d at 793–94.

Although the Board acknowledged that FMC's experience with the claim educated its personnel in government contract management and administration and that this was a benefit to the government, it concluded that the benefit was too remote and insubstantial to justify pro rata allocation of the legal costs as a G & A expense.

In *Lockheed,* the Court warned:

[w]e are not saying that any expenditure 'necessary' to a business generally, and therefore beneficial to all output, should be allocated to government contracts. There are some costs, for example advertising to establish a good image to attract talented employees, or charitable contributions, that may be 'necessary' in a sense, and that may benefit all work. Yet allocation may be denied because the necessity and benefit are too remote. We are saying that necessity and benefit

may have a somewhat different meaning for certain kinds of costs both as a matter of logic and policy.

375 F.2d at 796. The Court attached significance to the fact that, in *Lockheed*, the challenged cost was a tax. That fact "put it in a different category from charitable contributions, image-building or public relations expenses." The Court specifically stated, "our approach does not lead to any general rule or litmus paper test for allocability." *Id.* at 796–97.

In the present case, because the costs of marketing the multiplexor were costs that went directly to that product itself, any benefit to the government is too remote and insubstantial to make the cost allocable to the ICF contract.

Defendant prevails on this issue.

### 6. Profit Realized On The Sale Of An Option To Purchase Real Property

■ On September 14, 1978, KMS entered into a sublease with Bendix Corporation for the rental of property in Ann Arbor, Michigan. The rent was $13,650 per month. This amount was charged to KMS' cost reimbursement contracts through its G & A pool. On the same day KMS paid $50,000 for an option to purchase the identical property. The purchase of the option was consummated in a document separate from the sublease. KMS originally included amortization of the option cost in the indirect cost pools allocable to the current ICF contract. After February 28, 1981, KMS discontinued charging amortization. KMS claims it believed these costs were unallowable. KMS then credited the $20,485.60 which had previously been amortized to its indirect cost pools. In doing this, KMS repaid DOE the amount which had been amortized and previously reimbursed. The contract did not require KMS to disclose the details of the adjustment and DOE only became aware of the adjustment in 1983 when the 1981 indirect rates were audited. In 1984, KMS sold the option for a net profit of $324,153. The CO's final decision found that DOE was entitled to $311,948, which reflected the net profit ($324,153) less the related legal fees, selling costs, and additional amortization costs. The government has offset otherwise allowable costs in KMS' CY 1984 indirect cost pool to recoup this money.

DOE maintains that the option and lease constituted a single transaction and relates the lease payments to the option profit in order to capture that profit. DOE argues that 41 C.F.R. § 1–15.201–5 requires that the net gain be offset against the CY 1984 lease payments. 41 C.F.R. § 1–15.201–5 (1981) provides:

> The applicable portion of any income, rebate, allowance and other credit relating to any allowable cost, received by or accruing to the contractor, shall be credited to the Government either as a cost reduction or by cost refund, as appropriate.

In *Grumman Aerospace Corporation v. United States,* 218 Ct.Cl. 441, 587 F.2d 498, 505 (1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2837, 61 L.Ed.2d 283 (1979), the Court of Claims stated that the purpose of crediting provisions such as 41 C.F.R. § 1–15.201–5 is to ensure "that if the Government pays a cost and that cost is later reduced, by whatever means, the Government receives the benefit of the reduction." 587 F.2d at 505 (citation omitted).

DOE argues that the lease-associated costs are rent plus the cost of the option and that KMS' belated change of course in refraining from including the costs of amortizing the option in the indirect cost pools allocable to its government contracts cannot transform, after the fact, a single transaction into two separate transactions. The cost, argues DOE, is not the $50,000 paid for the option but the $887,250 rent paid by KMS under the lease from its inception until the end of February 1984. Defendant argues that KMS' original choice to amortize the option to purchase demonstrates that at the time of the purchase of the option KMS viewed the option and the lease as a single transaction. At oral argument DOE stated that if KMS had never charged the government for the option, the government would not now be entitled to recover.

KMS points to Michigan law for the proposition that whether an agreement to purchase an option and an agreement to lease property constitute one or two transactions depends wholly on the intent of the parties to the agreements. KMS argues that KMS and Bendix took great pains to separate the agreement to purchase the option from the agreement to sublease. The two agreements were executed on separate documents. The price for the option was not included in the rental payments but was priced in the option agreement. In drafting the sublease, the parties excluded the right to purchase the option from the terms of the prime lease which controlled the sublease. KMS presents the deposition testimony of Patrick Long, Chairman and Chief Executive Officer of KMS, which asserts that the option was acquired as an investment and to provide KMS with flexibility. Mr. Long also testified that he did not believe that the fact that KMS purchased the option was a consideration when negotiating the price of the lease. The deposition also asserts that the option amortization was reversed in a conscientious attempt to follow the applicable regulations and upon the advice of the DCAA auditor.

KMS further argues that, even if the execution of the sublease and option agreement constituted one transaction, 41 C.F.R. § 1–15.201–5 does not permit defendant to obtain a credit simply because a relationship between two transactions exists. The "income, rebate, allowance or other credit" must relate directly to an allowable cost for which the government has reimbursed the contractor. KMS argues that the only cost to which the profit on the option relates is the cost of the option, and since the $50,000 option price was separately negotiated and separately stated there is no basis for relating it to any other cost including the cost of the rental payments under the lease. KMS maintains that by reversing the option amortization and thereby repaying DOE for costs charged up to that time, KMS alone assumed the risk of the option purchase. That risk was assumed three years before the option was sold and in the midst of a recession which heavily impacted manufacturing states such as Michigan.

KMS also argues that DOE cannot claim entitlement to the profit simply because KMS once charged amortization of the option to its government contracts. KMS argues that if DOE's claims were based on amortization of the option standing alone, its recovery would, at best, be limited to the $20,485.60 previously amortized and repaid.

The court finds that DOE is not entitled to recover the rental costs because of the repaid amortization of the option payments. KMS and Bendix treated these transactions as if they were two separate transactions. The $50,000 option cost is far more than nominal and DOE has not provided any evidence that the rental payments were intended as compensation for the option. Nor has DOE shown any evidence or logical inference that the price of the option affected the rental costs. DOE is not entitled to offset the rental payments against the profit on the option simply because KMS mistakenly amortized the costs for two years, especially in a case such as the instant one where the cost of the amortization was refunded to DOE three years before the sale.

Plaintiff prevails on this issue.

## CONCLUSION

On the basis of the above discussion, the court finds the following:

1) On the issue of recovery of bid and proposal costs over the ceiling amount, the court DENIES the motions of both parties.

2) On the issue of the recovery of costs related to the Washington, D.C., office, the court GRANTS plaintiff's Motion for Summary Judgment and DENIES defendant's Motion for Summary Judgment.

3) On the issue of recovery of costs related to KMS' vice president's travel to Washington, D.C., the court GRANTS plaintiff's Motion for Summary Judgment and DENIES defendant's Motion for Summary Judgment.

4) On the issue of recovery of costs related to consulting services, the court

GRANTS plaintiff's Motion for Summary Judgment and DENIES defendant's Motion for Summary Judgment.

5) On the issue of recovery of costs related to the multiplexor, the court GRANTS defendant's Motion for Summary Judgment and DENIES plaintiff's Motion for Summary Judgment.

6) On the issue of recovery of costs related to the option to purchase real estate, the court GRANTS plaintiff's Motion for Summary Judgment and DENIES defendant's Motion for Summary Judgment.

Partial summary judgment may be granted upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. During the course of briefing in this case, the parties were able to resolve several issues not discussed here and stipulate as to various amounts. These agreements affect the amounts and rates that need to be considered in determining the amount of recovery to which KMS is entitled. The parties shall file a joint status report within 45 days from the date of this opinion discussing further proceedings in this case. The status report shall inform the court as to whether the parties have reached an agreement as to the amount on items 2, 3, 4, and 6 to which plaintiff is entitled or whether the parties feel that a decision as to the amount of the awards should be postponed until the resolution of item number 1 above.

IT IS SO ORDERED.